IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

United States District Court
Southern District of Texas
FILED

MAR 0 1 2000

Michael N. Milby
Clerk of Court

---

DANNY LIN MACCUNE,
     PLAINTIFF-APPELLANT,

VS.

CORREY NELSON (F.B.I. AGENT),
MATT MERTINEZ (F.B.I. AGENT),
MARK DOWD (ASSISTANT U.S. ATTORNEY),
MS. KOWALSKI-GARZA (ASSISTANT U.S. ATTORNEY),
HIDLA G. TAGLE (UNITED STATES DISTRICT JUDGE),
     DEFENDANTS-APPELLEES.

\*
\*
\*
\*
\*
\*
\*
\*
\*
\*
\*
\*

MISCELLANEOUS

CASE No: _____

B-00-014 1

---

CIVIL SUIT

    Plaintiff brought action against judge, prosecutors and Federal
Agent in their individual capacities, under civil rights statutes
and the Racketeer Influenced and Corrupt Organizations Act (Rico),
18 U.S.C. §§ 1961-1968; under 42 U.S.C. § 1983, Bivens claim for
violation of due process; Federal Tort Claims Act, 28 U.S.C. §§
1346, 2671-80; tortious interference with contract; multiple in-
stances of mail and wire fraud in violation of 18 U.S.C. §§ 1341
and 1343, multiple instances of extortion in violation of 18 U.S.C.
§§ 2 and 1951 and interstate travel in aid of extortion in viola-
tion of 18 U.S.C. §§ 2 and 1952.
    PLAINTIFF IS SEEKING COMPENSATORY AND PUNITIVE DAMAGES.

---

    Plaintiff, Danny Lin Maccune, alleges Rico Claim arising from Agents (mis-

presentations of Agents because they acted as guasi-prosecutor), prosecutors and

judge's alleged scheme to induce Danny Lin Maccune throughfraudulent promises to

enter into the Plea Agreement and then extort valuable and vital information from

Mr. Maccune by threatening that Mr. Maccune will be facing a significantly a long

period of time in Federal Penal Institution and will be losing his family. But if

he fully co-operate he will be placed in a Federal witness Protection Program.

FACTUAL ALLEGATIONS

    (1)  During Mr. Maccune's arrest F.B.I. Agents used excessive force, hand-

cuffed him and threw him on the ground.

CHUPDF - www.fox3o.com

(2)  Plaintiff was attacked by the **'fire Ants'** on the ground and when he informed the Agents that he is allergic to bees and fire Ants, the Agents laughed at him.

(3)  Finally, when the Agents uncuffed him, they did not take him to the hospital rightaway.  Plaintiff was in the hospital for two hours with oxegen mask on.

(4)  Agents negligence caused him great plain and sleep Apnea.

(5)  There was inhuman, unsanitary conditions in the city and county jails; whereas as a federal inmate plaintiff should have been housed in a federal facility rather than state.

(6)  The Agents and the prosecutors informed and advised him that if he cooperate fully and testify for the government against Mexican Mafia, he will be placed in the federal witness Protection Program.

(7)  The government advised his wife, Cindy May Maccune, and two minor children that they should be moved out of state immediately and when the family complied they received a $2,8000 check from the government to relocate but soon after the government ceased the money flow causing his family and him mental distress, mental anguish, humiliation and a terrible social havoc.

(8)  Due to the government's unwillingness to help his strugling family, Maccune's wife has to sell all of his property in **'dirt-cheap'** in order to survive.

(9)  Judge Hidla G. Tagle conspired with the government and sentenced the plaintiff to 112 months without trying to find out any other basis for downward departures under the Federal Sentencing Guideline Manual and did not ordered an evidentiary hearing after plaintiff's formal allucotion at sentencing where plaintiff raised prosecutorial misconduct and gross neglect.

(10)  Ms. Kowalski-Garza took part in the conspiracy at the sentencing stage (as well as false-promise stage) which was her overt act by informing the sentencing judge that the government has already withdrawn an enhancement of '20 to life' where Mr. Maccune could never face 20 to life (instead of 10 to life) because he doesn't have two prior felony conviction of either control substance

or crime of violance.

## THE CLAIMS

**CLAIM ONE:**  Federal Agent, Correy Nelson, violated Maccune's **Fourth Amendment Right** by subjecting him to excessive force.

**CLAIM TWO:**  Federal Agent, Matt Mertinez, violated Maccune's **Equal Protection Right** under the **Fourteenth Amendment** by using racial epithet/slurs (e.g. 'old County Punk', 'white-mule') while conversing with him.

**CLAIM THREE:**  While acting under color of state law, defendants-caused Maccune to be deprived of his federally protected constitutional right, under 42 U.S.C. § 1983.

**CLAIM FOUR:**  Plaintiff asserts **Bivens** claim for violation of due process against defendants because plaintiff's wife has to sell properties in order to survive and plaintiff wants to recover damages against federal officials.

**CLAIM FIVE:**  Federal Agents and prosecutors promised that maccune will be placed on the federal witness Protection Program and 50% downward departure under the plea agreement, where both promises failed violating **tortious interference** with contract law.

**CLAIM SIX:**  Plaintiff assert that the defendants not only deprived him of his constitutional rights but conspired to do so, violating **RICO** statute.

**CLAIM SEVEN:**  Defendants mailed Maccune his plea agreement and other court documents via United States mail violating **mail fraud,** 18 U.S.C. § 1341.  Plaintiff further alleges that defendants had conference with him via telephone line violating **wire fraud,** 18 U.S.C. § 1343.

**CLAIM EIGHT:**  Defendants threatened plaintiff that if he doesn't cooperate he will face a long time behind bar while comitting extortion in violation of 18 U.S.C. §§ 2 and 1951.  Further, plaintiff travelled one jurisdiction to another in order to help the government and testyfy on their behalf while comitting inter-state travel(i.e. commerce clause) in aid of extortion violating 18 U.S.C. §§ 2 and 1952.

**CLAIM NINE:**  Plaintiff asserts that Defendants conspired against him because of his lack of education, social power and political influence, violating § 1985(3).

### COMPLAINTS IN ACTIONS NOT PURSUED IN FORMA PAUPERIS ARE NOT SUBJECT TO "SCREENING" UNDER IN FORMA PAUPERIS STATUTE

It has been the rule in several cicuits "that a district court faced with a complaint which it believes may be subject to dismissal must.... notify all parties of its intent to dismiss the complaint [and] give the plaintiff a chance to either amend his complaint or respond to the reasons stated by the district court in its notice of intended Sua Sponte dismissal." **Tingler v. Marshall**, 716 F.2d 1109, 1112 (6th Cir. 1983). This rather forgiving common law doctrine was curtailed in 1996, however, with the passage of the prison litigation Reform Act of 1995 ("PLRA"), Pub.L. No. 104-134, §§ 801-810, 110 STAT. 1321(1996).

Responding to a perceived deluge of frivolous lawsuits, and, in particular, frivolous prisoner suits, congress directed the federal courts to review or "screen" certain complaints sua sponte and to dismiss those that failed to state a claim upon which relief could be granted, that sought monetary relief from a defendant immune from such relief, or that were frivolous or malicious.  See **28 U.S.C. § 1915(e)(2)** -( screeing provision within the in forma pauperis statute); 28 U.S.C. § 1915 A (screening of complaints filed by prisoners seeking redress from a governmental entity or its officers or employees).  **See, McGore v. Wrigglesworth**, 114 F.3d 601, 612 (6th Cir. 1997).  **28 U.S.C. § 1915(e)(2) provides:**

Notwithstanding any filing fee, or any portion thereof, that may have been paid, the court shall dismiss the case at any time if the court determines that-

(A)  The allegation of poverty is untrue; or

(B)  The action or appeal-

    (1)  is frivolous or malicious;

    (2)  fails to state a claim on which relief may be granted; or

    (3)  seeks monetary relief against a defendant who is immune from such relief.

In <u>Denton v. Hernandez</u>, 504 U.S. 25, 34, 112 S.Ct. 1728, 118 L.Ed.2d 340(1992), the Supreme Court held that a dismissal under former § 1915(d) was "not a dismissal on the merits, but rather an exercise of the court's discretion under the <u>in forma pauperis</u> statute, [and thus] the dismissal does not prejudice the filing of a paid complaint making the same allegations."

Admittedly, § 1915(e)(2) was revised by the PLRA.  Dismissal upon certain findings by the district court was made mandatory rather than permissive, and language was added directing dismissal "[n]otwithstanding any filing fee, or portion thereof, that may have been paid."  The addition of this language, however, must be considered in light of the PLRA'S other amendments to the in forma pauperis statute.  First, prisoners are now required to pay the full filing either initially, or through installment as specified in § 1915(b).  Second, congress has made it clear that the court should dismiss an in forma pauperis case at any time when grounds specified in § 1915(e)(2) become apparent.  In light of these factors, this can be conclude that the "notwithstanding"  language in § 1915(e)(2) does not expand § 1915(e)(2) beyound in forma pauperis cases.
Now the question arises:  Are complaints in actions not pursued in forma pauperis to be screened pursuant to § 1915(e)(2)?

The other circuits that have addressed the question agree that § 1915(e)(2) applies only to in forma pauperis action.  <u>See</u> <u>Bazrowex v. Scott</u>, 136 F.3d 1053, 1054 (5th Cir.)("As Appellant was not proceeding <u>in forma pauperis</u>, his complaint could not be dismissed pursuant to § 1915(e)(2).)", cert. denied,____U.S.___,      .
119 S.Ct. 156, 142 L.Ed.2d 128 (1998);
<u>Marks v. Solcum</u>, 98 F.3d 494, 495 (9th Cir. 1996)(" § 1915(e)(2)..... applies to prisoner proceedings in forma pauperis"); <u>POrter v. Fox</u>, 99 F.3d 271, 273 n.1 (8th Cir. 1996).

## BACKGROUND AND FACTS

(1)  The first night I was arrested on March 6, 1998, I was thrown on the ground, handcuffed, covered by '<u>fire ants</u>'.  One F.B.I. Agent told me that I had

CSIsPDF - www.fasoa.com

lot to worry about than fire ants. I begged the F.B.I. Agents to
help me getting them off of me. When they helped me after knowing
that I am allegic to bees and fire ants, they still ignored me
the fact that I need medical attention. They were more bussy
in questioning me than trying to find out my miserable situation.
After all, I am still a human. After 2 or more hours when I
was barning really bad and after constant begging they took me
to the hospital, we stayed at the hospital for 2 hours. The
doctor gave me a shot and put me on oxygen mask.

(2) I was booked in Harleygen City jail, that night.
I was put in a two men cell that still had human waste and extremely
filthy. I had a short sleeve shirt and a work pant. The air
ventilation was just straight above me. When I asked for a blanket
and a mattress, I got refused. The cold was so unbearable that
I had to wake up every 20 minutes. When I awoke up, one drunk
Mexican was looking at me. I tackled him when tried to jump
on me. I was refused a basic necessity of tooth paste and tooth
brush. I was fed a roll for breakfast, two bean buritos for
lunch and dinner. It was no inhuman I have to cry and beat on
the bars for the guard to help me. I was thinking about is it,
America all about? Am I an American? The city police in jail
called the F.B.I. and they came to pick me up. The guards and
Agents were laughing about me and referred me as **'cry baby'**.
On the way to a different jail, Agent Correy Nelson told me,
"it's gonna go lot worst than this country boy unless you talk."

(3) They took me to Brownsville county jail next and put
me in a cell of 100 inmates where the capacity is only 40. One
blanket a night and sleeping on the concrete floor let me thinking.
No tooth paste and brush, no toilet paper, stinky as hell, people

throwing up blood.  When I went in front of the judge, F.B.I.
made an inmate to wear a musk and when the judge asked the Agent
said he had"**Hepatitis C**" but ironically he was the guy who was
in our cell.  It seemed to me, the Agents want to send me a message:
'work for us, it's gonna go bether.'

(4)  Finally, they moved me to a cell where my co-defendant
was housed.  My life was threatened because my codefendant informed
other inmates that I am a **'snitch'.**  After confiring with my
attorney, I decided to cooperate and I was seperated from my
codefendant, I guess as a token of reward for deciding to work
with the **'feds'** the jail officers were so corrupt that they took
notes from inmates to inmates and pass around.  I went to court
and Correy Nelson let me use his cellular phone to call my wife.

(5)  When I got moved to the city jail, I lost my Bible,
pictures and address book from the previous jail and jail officer's
answer was, so inmate stole them.  In city jail, the smell was
gross, dirty and you can take a shower only once a week.  Everytimes
the Agents came to see me, they used to bring food for me.  My
attorney brought both paste and brush.  Agents were telling me
that if I fully cooperate they will help my wife, children and
look out for me.  Then Matt Mertinez told me,  "Mr. Maccune if
you help us convict the Mexican mafia, we will put you in the
Federal witness Protection Program, we will change your name,
social security number, date of birth.  And you will get a good
job."  When I asked, 'how about my family?'  He said, "their
name and everything gonna we changed also.  If you testify, we
will move them to a different state and put them in the witness
program that way you can join them when you are done within
a year or so."

(6)  From the court, Agents to me to the prosecutor's office and let me use the office phone.  I called my wife and discussed with her about the offer.  She agreed to move.  Agent gave her $2,800 for relocation and promised to pay more.  Back at the county jail, one Mexican inmates bailed some jail guards and he was placed in a cell of 12 by himself.  He gets pizza, six pack of soft drink and cigaretts.  When I informed this to Matt Mertinez he assured me that I can like that inmate I do exactly what they tell me to do.  Agents also keep assuring me that my wife and kids are safe and sound.

(7)  I got a message via a jail guard from my codefendant that he wanted to talk to me.  When I agreed, the guard brought him on the other side of the bar.  My codefendant told me that if I open my mouth his people will kill my entire family.  I informed this to both Correy Nelson and Matt Mertinez and they assuered me of great safety and all. At the meeting with my attorney present, prosecutor Mark Dowd, Ms. Kowalski-Garza and the Agents we discussed me testifying against the Mexican mafia.  Prosecutor Mark Dowd reassured me that I will be placed under the Federal witness Protection Program.

(8)  I testified at the trial and the Mexican mafia was convicted.  After the verdict when I spoke to my wife she informed me that she had no money.  She had only two days left at the motel, after that she did not know what to do.  She needed money to eat.  She called my lawyer and he sent her $1,000 to pay the rent deposit and buy some food.  F.B.I. Agents told her that they can not send her any more only and she had to find a job. And  the widely talked about the Federal witness Protection Program suddenly was out of the question.  My wife started to sell our

properties day by day just to survive.  She has no education
and she never worked since I married her for 18 years.

(9)  I got moved to Victory county jail.  For some weird
reason, my codefendant is there too.  What's wrong with this
system?  In that jail the foods were terrible.  There were mold
on the food everyday.  All the inmates started to give me hard
time because the word is out, I am a **'snitch'**.  One day two guys
threw real hot water on me, beat me, gave me black eye and started
to take food away from my tray in every single meal.  So my wife
called the Agents, **again**, and the U.S. marshalls were informed
to move me but they move like **Tortise.**

(10)  I started to feel real sad.  My attorney coudn't
do anything for me.  I kept asking him why didn't he get all
this in writing from the government?  I never got the answer.
Hopefully, the court of appeals can answer my question.

(11)  In March of 1999, one prosecutor and two Agents flew
from Texax to Ohio and came to see me at Elkton, Ohio.  They
asked me questions about Banda and showed me some pictures and
wanted to know who they were.  I helped them as much as I could.
They told me if I help them fully and cooperate I will receive
1/3 of my remaining time.  I informed that I want this in writing
because I am no more playing **'games'** with **'feds'.**  Also I did
tell them everything I knew, when I asked for their business
cards, they told me that they will mail me their cards; up until
today I haven't seen those cards.

RICO CLAIM:  (CLAIM NO. 6)

To recover on a civil claim for damages under **Rico**, a plaintiff
must show (1) a violation of 18 U.S.C. § 1962; (2) injury to

plaintiff's business or property; and (3) causation of the injury
by the violation.

See **Powers v. British Vita, P.L.C.**, 57 F.3d 176, 187(2d Cir.
1995);

Hence, the **Rico** claims require "(1) a person who engages in (2)
a pattern of racketeering activity, (3) connected to the acquisition,
establishment, conduct, or control of an enterprise." **word of
faith world outreach center church,** INC. V. Sawyer, 90 F.3d at
122, quoting **In re Burzyneki**, 989 F.2d 733, 741-42 (5th Cir.
1993). The Federal Agents and prosecutors warned Mr. Maccune
that if he did not cooperated he would be facing a significantly
long period oftime but if he cooperate he would be placed on
Federal witness Protection Program. So Maccune's extortion claims
satisfy the first element requiring a violation of § 1962. The
government made a false promise to Mr. Maccune. Their intent
was **bad** from the beginning. The intention was to take whatever
the government **needed and wanted** by fraudulent means. Therefore,
Mr. Maccune's fraud claims satisfy the third element because
the alleged fraud caused Mr. Maccune **'grave injury and pain'**.
Mr. Maccune's wife had to sell all the properties at a drastic
discounted rate that satisfy the second element.

   To establish a violation of § 1962, a plaintiff must satisfy
seven constituent elements:
(1) that the defendant (2) through the commission of two or
more acts (3) constituting a "pattern" (4) of "racketeering activity"
(5) directly or indirectly invests in, or maintains an interest
in, or participates in (6) an "enterprise" (7) the activities
of which affect interstate commerce. **See** 18 U.S.C. § 1962 (a)-
(c)(1994). **See Sedima, S.P.R.L. V. Imrex Co.**, 473 U.S. 479,

105 S.Ct. 3275, 87 L.Ed.2d 346 (1985); **Moss v. Morgan Stanley**, 719 F.2d 517 (2d Cir. 1983). Mr. Maccune has established extortion claims under RICO because a requisite element needed for a violation of § 1962 has been established and well founded-that the defendants engaged in "racketeering activity."

"Racketeering activity" within the meaning of the statute is defined in § 1961(1). Although extortion is listed in § 1961 (1)(a) and (c) as a valid predicate act of racketeering, plaintiff does put forth evidence of duress sufficient to support a claim of extortion as a matter of law. Under federal law, extortion requires the obtaining of property from another, with his consent, induced either by wrongful use of actualor threatened force, violence or fear or under color of official right. **See** 18 U.S.C. § 1951(a)(2). Here **'property'** element is plaintiff's wife, 2 minor children (age 9 and 11) and personal property (e.g., house, cars, tractor trailers, tools, land, electronics products etc) which he lost because of false promises and coercion by Agents, prosecutors and the judge 'Tagle'.

Unlike other claims, a RICO claim must be plead with "specific facts, not mere conclusions, which establish" the elements of a claim under the statute. **Montesano v. Seafirst Commercial Corp.**, 818 F.2d 423, 427(5th Cir. 1987). The claim must also allege specific facts to demonstrate that the defendant and the RICO enterprise are separate entities. **See Ashe v. Corley**, 992 F.2d 540, 544(5th Cir. 1993); **Marax v. McNamara**, 842 F.2d 808, 811(5th Cir.1988). In the present case, the defendants and the alleged RICO enterprise are not one and the same. The defendants are: Agent Correy Nelson, Agent Matt Mertinez, AUSA Mark Dowd, AUSA Kowalski-Garza, judge Hidla G. Tagle. The Rico enterprise

is **'the prosecution of all criminal defendants'** in the Browsville division.  Mr. Maccune's claims are also sufficient.

The defendants may assume that governmental entities "are not capable of forming the criminal intent necessary to support the predicate **RICO** offenses.  **See Lancaster Community Horp. v. Antelope Valley Horp. Dest.**, 940 F.2d 397, 404 (9th Cir. 1991), cert. denied, 502 U.S. 1094, 112 S.Ct. 1168, 117 L.Ed.2d 414(1992)". In the present case at bar **'that unthinkable thing'** happened. And yes indeed the government officials both in their official as well as individual capacities has committed **RICO**.  This happens in a day by day basis.  Plaintiff believes that the United States Supreme court should make the decision whether the district court has this kind of **abuse of power**.

Additionally, Mr. Maccune's claims are sufficient to establish the required ongoing criminal activity required by **RICO**.  As previously noted, **"Racketeeringactivity"** consists of two or more predicate offenses.  In order to establish a **"pattern"** of racketeering activity, a plaintiff "must show that the racketeering predicates are related, and that they amount to or pose a threat of continued criminal activity." **Word of Faith**, 90 F.3d at 122, quoting **H.J., Inc. v. Northwestern Bell Telephone Co.**, 492 U.S. 229, 239, 109 S.Ct. 2893, 106 L.Ed.2d 195(1989).  Continued criminal activity, or the threat of the same, must be shown by either a "closed period of repeated conduct, or an open-ended period of conduct that 'by its nature projects into the future with a threat of repetition.'" **Id.**

A closed period of conduct may be demonstrated "by proving a series of related predicates extending over a substantial period of time."  An open period of conduct involves the establishment of "a threat of continued racketeering activity."  This may be

-12-

shown where there exists a "specific threat of repetition extending indifinitely into the future", or "where it is shown that the predicates are a regular way of conducting defendant's ongoing legitimate business."

The allegation of Mr. Maccune's complaints are also sufficient to establish the required continuity of criminal activity; as noted, the specific facts all relate to the events occurred. It is extremely important to note that the**'establishment of continuity'** is one of the vital elements of <u>RICO</u> claim.

In the first case, a doctor alleged that during the course of a lawsuit with an insurance company over payment of claims, the insurance company and others committed many fraudlent acts, including sending letters to other insurers to dissuade them from paying on the doctor's claims; creating a company to generate negative reviews of the doctor's methods of treatments; and "goading" government agencies into investigating the doctor.  In re **Burzynski,** **989 F.2d 733 (5th Cir.1993).**  This court concluded that the doctor failed to plead the continuity element of a "pattern of racketeering". All of the alleged predicate acts took place as part of the Burzynski I litigation, which has ended.  In **[Delta Truck & Tractor, Inc. v. J.I. Case Co.,** 855 F.2d 241 (5th Cir.1988), cert. denied, 489 U.S. 1079, 109 S.Ct. 1531 [103 L.Ed.2d 836]  (1989)], we affirmed the dismissal of a <u>RICO</u> claim where the plaintiff alleged multiple acts of fraud that were part and parcel of a single, discrete and otherwise lawful· commercial transaction.  In Delta, the lawful transaction was a merger; here, it is the defense of a lawsuit-which is now over.  The contern criminal activity. In re **Burzynski, 989 F.2d at 743.**

Similarly, in **Calcasieu Marine Nat'l Bank v. Grant,** 943

CIMPDF - www.teda.com

F.2d 1453 (5th Cir.1991) the court found a lack of continuity.
The plaintiff, Mrs. Grant, sued her former husband for interest
in a partnership in which he had been an active member.  To establish
continuity, Mrs. Grant claimed a closed period of conduct.  The
court held, however, that there is no threat here of continued
criminal acts.  [Mr.] Grant's acts which were alleged to have
deprived Mrs. Grant of a property interest were, when completed,
without threat of repetition.  Short-term criminal conduct is
not the concern of RICO

Calcasieu, 943 F.2d at 1464.

        The earliest case that discusses the element of continuity
under RICO, albeit before the Supreme Court's decision in H.J.
Inc., is Delta Truck & Tractor, Inc. v. J.I. Case Co., 855 F.2d
241 (5th Cir.1988), cert. denied, 489 U.S. 1079, 109 S.Ct. 1531,
103 L.Ed.2d 836 (1989).  Delta Truck, an International Harvester
dealer, alleged that International Harvester, J.I. Case Co.,
and Tenneco, Inc. had committed numerous predicate acts of wire
and mail fraud in connection with the acquisition of International
Harvester by Case and Tenneco.  The district court dismissed
the complaint.  This court affirmed, focusing on the concept
of continuity as incorporated in the enterprise element of RICO.
The court stated:
Delta has attempted to state a RICO claim by alleging multiple
acts of fraud that were part and parcel of a single, discrete
and otherwise lawful commercial transaction.  This claim fails
to state a RICO cause of action as a matter of law because the
pleadinds do not assert that the corporate defendants posed a
continuous threat as a RICO person.  Delta has alleged as a pattern
of racketeering activity nothing more than numerous predicate
acts which were necessary segments of an otherwise legitimate

-14-

and singular commercial endeavor. **Id at 244.**

It is unnecessary to delve into the arcane concepts of closed-end or open-ended continuity under **RICO**. Burzynski, Calcasieu, and Delta Truck make clear that where alleged RICO predicate acts are part and parcel of a single, otherwise lawful transaction, a "pattern of racketeering activity" has not been shown.

The law in other circuits might have allowed this case to proceed further. **See Shields Enterprises, Inc. v. First Chicago Corp.,** 975 F.2d 1290 (7th Cir. 1992) (where defendant used extortion every time it wished to accomplish a goal in dealing with plaintiff, a pattern could be shown); **Ticor Title Ins. Co. v. Florida,** 937 F.2d 447 (9th Cir. 1991) (three forgeries within thirteen month period suggests a regular way of conducting business); **United States v. Busacca,** 936 F.2d 232 (6th Cir.), cert. denied, 502 U.S. 985, 112 S.Ct. 595, 116 L.Ed.2d 619 (1991) (where defendant misappropriated money whenever an expense was incurred, a pattern was established); **Ikuno v. Yip,** 912 F.2d 306 (9th Cir. 1990) (pattern requirement met with the filing of two allegedly false annual reports). The precedents of this circuit concerning continuity are consistently different from these cases.

In this case, the alleged predicate acts occurred from the day Mr. Maccune was arrested and it was ongoing and **still is** and **still will be**. There isn't any discontinuity in this case. For an example, where Mr. Maccune will keep filing **habeas motions,** the district court will keep responding on them. Hence, the process is ongoing. Accordingly, plaintiff prays this court that his claims under **RICO** should be granted.

-15-

## MAIL AND WIRE FRAUD CLAIMS
## (CLAIM NO. 7)

Mr. Maccune also asserts predicate acts of mail and wire fraud under **RICO**, alleging that the same activities on the part of defendants that form the basis for his common law fraud claim also amount to a violation  of **RICO**, 18 U.S.C. § 1962(a)-(d).  Here the defendants may argue that because Mr. Maccune cannot show reasonable reliance upon defendant's alleged 'false promises, misrepresentation, bribe,' he cannot establish **RICO** predicate acts of mail and wire fraud.  This argument (of defendants if they try that **'route'**) will ignore the well established rule that the common law requirement of justifiable reliance is **'not an element'** of wire  or mail fraud under federal law.  See **Nedez v. United States**, __U.S.__,__, **119 S.Ct. 1827, 1841, 144 L.Ed.2d 35(1999)**.  Therefore, since the applicable mail and wire fraud statutes do not require the element of justifiable reliance, Mr. Maccune does sufficiently allege predicate acts of racketeering activity based solely on his allegation of misrepresentation and false promises by defendants and thus satisfies the first element of a claim under **RICO.**

Although justifiable reliance is not necessary to establish predicate acts of mail and wire fraud, Maccune must none the less establish justifiable reliance to satisfy a different element of his **RICO** claim, that of injury to Maccune's business (i.e. in this case more incarceration) or property (including his family).  After a plaintiff shows that defendants have violated § 1962, he must further show that the predicate act caused the injury for which plaintiff seeks recovery.  **See Power**, 57 F.3d at 188. **Metromedia Co. v. Fugazy**, 983 F.2d 350,

-16-

368 (2d Cir. 1992). <u>RICO</u> **provides** that "any person injured
in his business or property by reason of a <u>RICO</u> violation may
bring a civil action to recover treble damages." 18 U.S.C.
§ 1964(c). Courts have interpreted the phrase **"by reason of"**
to require that there be a causalconnection between the prohibited
conduct (e.g., Agents and Mark Dowd should not have given **false
hope** of no time and placement of **witness Protection Program**
allurement to Mr. Maccune.) and the plaintiff's injury. See
<u>Powers</u>, 57 F.3d at 188, <u>First Nationwide Bank</u>, 27 F.3d at 766;
<u>Standard Owners Ass'n v. Roosevelt Raceway Assocs.</u>, 985 F.2d
102, 104 (2d Cir. 1993). Where mail or wire fraud is the <u>RICO</u>
predicate act; plaintiff must show justifiable reliance to
establish causation. <u>See **Fugazy**</u>, 983 F.2d at 368.
<u>See Holmes v. Securities Investor Protection Corp.</u>, __U.S.__,
112 S.Ct. 1311, 117 L.Ed.2d 532 (section 1964(c) requires plaintiff
to establish proximate cause). In the context of an alleged
<u>RICO</u> predicate act of mail fraud, Maccune have to establish
the required causal connection, as required Mr. Maccune has
very easily demonstrated that the defendants **"misrepresentation"**
were relied on '<u>**very heavily**</u>.' See <u>Brandenburg v. Seidel</u>,
859 F.2d 1179, 1188 n. 10(4th Cir.1988); <u>Grantham & Mann, Inc.</u>
<u>v. American Safety Products, Inc.,</u> 831 F. 2d 596, 606 (6th
Cir. 1987).

Though there is no bright time test for determing precisely
what period of time is "substantial" for purposes of finding
the continuity necessary to establish a <u>RICO</u> pattern, the Supreme
Court in <u>H.J. Inc. v. Northwestern Bell Telephone Co.,</u> 492
U.S. 229, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989), stated that
"[p]redicate acts extending over a few weeks or months and
threatening no future criminal conduct do not satisfy this

-17-

requirement." <u>Id</u>. at 242, 109 S.Ct. at 2902.  Periods of  19
or 20 months, however, have been held sufficient to support a
finding of continuity, See <u>United States v. Pelullo</u>, 964 F.2d
193, 210 (3d Cir.1992) (19 months sufficient); <u>United States v.
Stodola</u>, 953 F.2d 266, 270 (7th Cir.1992), (closed-ended period
of 20 months sufficient), cert. denied, __U.S.__, 113 S.Ct. 104,
121 L.Ed.2d 63 (1992), and "where continuity can be inferred from
the jury's findings, an erroneous instruction may constitute harmless
error." <u>United States v. Pelullo</u>, 964 F.2d at 209; See <u>United
States v. Kotvas</u>, 941 F.2d 1141, 1144-45 (11th Cir.1991).

Ergo, Maccune's claim No. 7 should be granted as a valid
claim.

## <u>CLAIM UNDER § 1983</u>

### <u>CLAIM NO. 3</u>

Title 42 United States Code, § 1983 (" § 1983") creates
a cause of action against any person who, while acting under color
of state law, causes another to be deprived of a federally protected
constitutional right.  Section 1983 provides, in pertinent part:

Every person who, under color of  any statute, ordinance,
regulation, custom or wage, of any state........ subjects or causes
to be subjected, any citizen of the United States or other person
within the jurisdiction thereof to the deprivation of any rights,
privileges, or immunities secured by the constitution and laws
shall be liable to the party injured in an action at law, suit
in equity or other people proceeding for redress.........

Section 1983 was promulgated to prevent ".........[a
government official's][m]isuse of power, possessed by virtue of
state law and made possible only because the [official] is clothed
with the authority of state law."

-18-

**Johnston v. Lucas**, 786 F.2d 1254, 1257 (5th Cir.1986).  See also **Whitley v. Albers**, 475 U.S. 312, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986) (8th Amendment); **Davidson v. Cannon**, 474 U.S. 344, 106 S.Ct. 668, 88 L.Ed2d 677(1986) (14th Amendment); **Daniels v. Williams**, 474 U.S. 327, 106 S.Ct. 677, 88 L.Ed.2d 662 (1986) (14th Amendment). Only two allegations are required in order to state a cause of action under § 1983.  "First, the plaintiff must allege that some person has deprived him of a federal right.  Second, he must allege that the person who has deprived him of that right acted under color of state or territorial law." **Gomez v. Toledo**, 446 U.S. 635, 640, 100 S.Ct. 1920, 64 L.Ed.2d 572(1980); **Manax v. McNamara**, 842 F.2d at 812.

The allegations of Maccune's complaints center upon actions taken by **Federal** officials pursuant to **Federal** law.

"We have repeatedly noted that 42 U.S.C. § 1983 [42 USCS § 1983] creates a species of tort liability." **Memphis Community School Dist. v. Stachura**, 477 U.S. 299, 305, 91 L.Ed2d 249, 106 S.Ct. 2537 (1986) (internal quotation mark omitted).  "[O]ver the centuries the common law of torts has developed a set of rules to implement the principle that a person should be compensated fairly for injuries caused by the violation of his legal right. These rules, defining the elements of damages and the prerequisites for their recovery, provide the appropriate starting point for the inquiry under § 1983 as well." **Carey v. Piphus**, 435 U.S. 247, 257-258, 55 L.Ed.2d 252, 98 S.Ct. 1042 (1978).  Thus, to determine whether there is any bar to the present suit, we look first to the common law of torts.  Ct.**Stachura, Supra,**at 306, 91 L.Ed.2d 249, 106 S.Ct. 2537.

**Imbler v. Pachtman**, 424 U.S. 409, 417 L.Ed.2d 128, 96 S.Ct. 984(1976)

-19-

(Section .1983 'creates a spicies of tort liability that on its face admits of no immunities.)

**Anderson v. Creightor**, 483 U.S. 635, 645, 97 L.Ed.2d 523, 107 S.Ct. 3034(1987) ("[w]e have never suggested that the precise contours of official immunity [under § 1983] can and should be slavishly derived from the often arcane rules of the common law.")

"A § 1983 claim has two essential elements: (1) the defendant acted under color of state law; and (2) as a result of the defendant's actions, the plaintiff suffered a denial of [his] federal statutory rights, or [his] constitutional rights or privileges." **Annis v. County of Westchester**, 136 F.3d 239, 245 (2d Cir.1998) (citing **Eagleston v. Guido**, 41 F. 3d 865, 872 (2d Cir.1994), cert. denied, 516 U.S. 808, 116 S.Ct. 53, 133 L.Ed. 18 (1995).

## MACCUNE HAS STATED CLAIMS

To state a claim under § 1983, Maccune must allege the violation of a right secured by the constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law. **West v. Atkins,** 487 U.S. 42,48, 108 S.Ct. 2250, 101 L.Ed.2d 40 (1988).

When damages are sought in a § 1983 action, the defendant must be responsible for the alleged constitutional deprivation. **Wright v.Smith**, 21 F.3d 496, 501 (2d Cir.1994); **Al-Jundi v. Estate of Rockefeller,** 885 F.2d 1060, 1065 (2d Cir.1989). "[T]he general doctrine of respondent superior does not suffice and a showing of some personal responsibility of the defendant is required." **Al-Jundi**, 885 F.2d at 1065 (internal quotations omitted). A defendant who occupies a supervisory position may be found personally involved in the deprivation of a plaintiff's constitutionally protected

rights in several ways.  **See Williams v. Smith**, 781 F.2d 319,
323-24 **(2d Cir.1986)**.  The defendant may have directly participated
in the infraction; the official, after learning of the violation
through a report on appeal, may have failed to remedy the wrong;
the official may be liable because he or she created a policy
or custom under which unconstitutional practices occured, or
allowed such a policy or custom to continue; and lastly, a supervisory
official may be personally liable if he or she was grossly negligent
in managing subordinates who caused the unlawful condition or
event.  **Wright**, 21 F.3d at 501; **Williams**, 781 F.2d at 323-24.
In addition, supervisory liability may be imposed where an official
demonstrates "gross negligence" or "deliberate indifference" to
the constitutional rights of a plaintiff by failing to act on
information indicating that unconstitutional practices are taking
place.  **Wright**, 21 F.3d at 501.

Mr. Maccune brought § 1983 action against Agent Correy
Nelson and Matt Mertinez, alleging use of excessive force and
coerced him to cooperate with the government and placed him in
different jails under inhuman conditions that way Mr. Maccune
had to break down and work with the Agents.  Prosecutor Mark Dowd
and Ms. Kowalski-Garza informed Maccune that he might receive
a longer sentence if he did not cooperate to the fullest extent.
This violated Maccune's constitutional right to **'fair trial.'**
Mr. Maccune was nothing but a driver.  He didn't know that there
would be cocaine in the truck.  He was forced to drive the truck
with marijuana and cocaine.  He would have received only $5,000
for the whole transaction.  If Maccune would have taken his case
to the trial and got convicted he would not receive 112 months.
He would have received less.  Hence, Maccune has a valid claim

-21-

under § 1983.

In our criminal justice system, the decision whether to prosecute an individual is vested with the government. **See Wayte v. United States**, 470 U.S. 598, 607, 105 S.Ct. 1524, 1530, 84 L.Ed.2d 547 (1985); **United States v. Sparke**, 2 F.3d 574, 580 (5th Cir.1993). That decision "is within the United States Attorney's substantial discretion and is generally not subject to judicial review absent a showing of actual vindictiveness or an equal protection violation." **United States v. Ballard**, 779 F.2d 287, 295 (5th Cir.1986) (footnote omitted). The broad discretion affored a prosecutor "rests largely on the recognition that the decision to prosecute is particularly ill-suited to judicial review." **Wayte**, 470 U.S. at 607, 105 S.Ct. at 1530; See **United States v. Amstrong,** 517 U.S. 456, 465, 116 S.Ct. 1480, 1486, 134 L.Ed.2d 687(1996). As a general rule, then, substantial deference is accorded decisions requiring the exercise of prosecutorial discretion.

In keeping with the need to avoid judicial second-guessing of prosecutorial decisions, we have never held that similarly situated defendants must be treated identically. We allow the government discretion to decide which individuals to prosecute, which offenses to charge, and what measure of punishment to seek. Cf. **United States v. Batchelder**, 442 U.S. 114, 124, 99 S.Ct. 2198, 2204, 60 L.Ed.2d 755 (1979) ("whether to prosecute and what charge to file or bring before a grand jury are decisions that generally rest in the prosecutor's discretion.")

If the equal protection and due process guarantees do not divest the government of its discretionary authority to select which individuals it will prosecute, what charges it will bring, and what punishment it will seek, then the prosecutor will definitely

abuse their power in a society where three out of ten people are
going to jail. This is not to say that the government may wield
its prosecutorial power in an invidious or arbitrary manner.
Although prosecutorial discretion is broad, it is not unbounded.
See **Wayte**, 470 U.S. at 608, 105 S.Ct. at 1531. "In particular,
the decision to prosecute may not be deliberately based upon an
unjustifiable standard such as race, religion, or other arbitrary
classification, including the exercise of protected statutory
and constitutional rights." **Id.** (internal quotes and citations
omitted); See **Armstrong**, 517 U.S. at 464-65, 116 S.Ct. at 1486.
We ascertain whether a particular enforcement decision is impermissible
by applying equal protection standard. **See Wayte**, 470 U.S. at
608, 105 S.Ct. at 1531. To succeed with a selective prosecution
claim, a defendant must demonstrate that the enforcement had a
discriminatory effect and was motivated by an invidious purpose.
See **Id.**; Sparks, 2 F.3d at 580; **United States v. Hoover**, 727 F.2d
387, 389 (5th Cir.1984); Johnson, 577 F.2d at 1308.

Mr. Maccune was under the impression that the government
will cut him loose if he fully cooperate. In **Johnson v. Morel,
876 F.2d 479,** the Fifth circuit restated the test for qualified
immunity in the context of excessive force: a claim for excessive
force in violation of the Constitution requires (1) an injury
(2) which resulted directly and only from the use of force that
was clearly excessive to the need and (3) the force used was
objectively unreasonable. **876 F.2d 477**, 480 (5th Cir.1989) abrogated
on other grounds. **Harper v. Harris County, Tex.,** 21 F.3d 597 (5th
Cir.1994).

In **Johnson**, the Fifth circuit stated that in order to make
out a due process violation, the plaintiff must show that he suffered

a "significant injury."  The Supreme Court subsequently overruled
the significant injury prong in the context of a claim of excessive
force under the Eight Amendment, **Hudson v. McMillian**, 503 U.S.
1, 8, 112 S.Ct. 995, 117 L.Ed.2d 156(1992) and, applying Hudson,
we have concluded that the plaintiff is no longer required to
show a significant injury in the Fourth Amendment context either.
**Harper v. Harris County, Tex.**, 21 F.3d 597, 600 (5th Cir.1994).

Nevertheless, the Fifth Circuit do require a plaintiff
asserting an excessive force claim to have "suffered at least
some form of injury," **Jackson v. R.E. Culbertson**, 984 F.2d 699,
700 (5th Cir.1993).  Furthermore, Fifth circuit has shaped the
analysis so that a cause of action for every contact between
a citizen and a police officer will not be permitted:

In just about every conceivable situation, some amount
of force or contact would be too nominal to constitute a constitu-
tional violation.  When the force used is insufficient to satisfy
the legal standard necessary for recovery, the amount of force
is de minimis for constitutional purposes.

**Ikerd v. Blair**, 101 F.3d 430, 434 (5th Cir.1996).  In determining
whether an injury caused by excessive force is more than de minimis,
we look to the context in which that force was deployed.  "[T]he
amount of injury necessary to satisfy our requirement of 'some
injury' and establish a constitutional violation is directly
related to the amount of force that is constitutionally permissible
under the circumstances."  **Id.**

What constitutes an injury in an excessive force claim
is therefore subjective-it is defined entirely by the context
in which the injury arises.

In this case, Maccune alleges that he suffered physical
injury from the first encounters with the Agents while he was

24

handcuffed and thrown on the ground with fire ants.   Maccune
makes the following factual allegations:

(1)   he was thrown on the ground with force;

(2)   while on the ground, he could not breathe or swallow, and
experienced dizziness;

(3)   the incident caused him to cough and to have to catch his
breath;

(4)   he was about to loose his life; and

(5)   he is suffering from sleep apnea.

Mr. Maccune believes that Agents were motivated entirely
by malice.   Agents were therefore not legitimately exercising
force in the performance of their duties as federal officials.
This court must determine whether, in the context in which the
force was used, Maccune's loss of breath, dizziness, sleep apnea
and fear for his life with ant sting scar still on his body amount
to injury sufficient to allege a constitutional violation.   In
this context, Maccune asserts that, although suffering from dizziness,
loss of breath, coughing, sleep apnea, sting scar, being on oxygen
mask for two hours are not significant injuries, combined, they
qualify as a cognizable injury when the victim is maliciously
assulted by Federal Agents.

Having concluded that, for purposes of his § 1983 claim, Maccune
suffered a cognizable injury from the incident, we must turn to the
second and third **Johnson** elements-whether the injury resulted from
the use of force that was clearly excessive and whether that force
was objectively unreasonable.   In this case, both elements are clearly
met.   There can be no justification for Agents' allegedly malicious
excessive force.   Since Maccune has succeeded in presenting evidence
that establishes a § 1983 claim for excessive force, the district

court should not grant summary judgement in favour of the defendants.

Thus, Maccune suffered damages.  See e.g., **Knight v. Caldwell,** 970 F.2d 1430, 1432-33 (5th Cir.1992) (arrestee must prove that he suffered some injury in order to prevail in an excessive force claim), cert. denied, 507 U.S. 926, 113 S.Ct. 1298, 122 L.Ed.2d 688(1993); **Murphy v. Neuberger,** 94 Civ. 7421, 1996 WL 442797 at *8 (S.D.N.Y. Aug. 6, 1996) ("Although the injuries suffered need not be permanent or severe to recover under an excessive force claim,.... plaintiff's complaint does not allege any injuries resulting from the use of handcuffs.  Plaintiff only asserts that he was forced to travel to Albany in a 'painful, cramped, dehumanizing position.'....  Because the facts alleged do not constitute excessive force, plaintiff's claim is dismissed.")

Look at **Landy v. Irizarry,** 884 F.Supp. 788, 779 n. 14 (S.D.N.Y.1995) (Wood, D.J.) (PLaintiff alleges no injury as a result of being kicked. An arrestee must prove some injury, even if insignificant, to prevail in an excessive force claim."); **Roundtree v. City of New York,** 778 F.Supp. 614, 622 (E.D.N.Y.1991) (dismissing plaintiff's excessive force claim because "[t]o allege that [plaintiff] was 'with undue force, pushed... into one of the ... cars' and that his injuries from this push were 'emotional pain and suffering' is not to state a claim that the use of force was 'unreasonable'.  Indeed, to conclude that a 'push' that does not cause the slightest of physical injuries to the plaintiff is nonetheless an actionable use of excessive force would be to hold that any physical contact by an arresting officer with the arrested person is actionable.  This would transform the constitutional wrong of excessive force in arrest into the common law tort of battery; and it would reduce the holding in **Graham [v. Connor,** 490 U.S. 386, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989) ] into

an empty proposition against which no use of force is reasonable
as a matter of law.").

## PERSONAL INVOLVEMENT

"It is well settled in the Circuits that **'personal involvement**
of defendants in alleged constitutional deprivations is a prerequisite
to an award of damages under § 1983.'" **Alright v. Smith**, 21 F.3d
496, 501 (2d Cir.1994); accord, e.g., **Fishe v. Armitage,** 128 F.3d
50, 55 (2d Cir.1997); **Jachson v. Johnson**, 15 F.Supp.2d 341,365(S.D.N.Y.1989).
"In order to maintain a cause of action [under § 1983] against any
official, a plaintiff must show that the defendant was personally
involved in the alleged deprivation of his constitutional rights,
since the doctrine of respondent superior does not apply to § 1983
actions." **Wiesner v. Willkie Farr & Gallagher**, 88 Civ. 8753, 1989
WL 129510 at *1 (S.D.N.Y.Oct. 20,1989) (Wood, D.J.),aff'd mem., 907
F.2d 145 (2d Cir.1990).

Mr. Maccune spent lots of time talking to and meeting with Agent
Nelson, Agent Mertinez, AUSA Dowd and AUSA Garza in their offices
as well as court houses, Agents used to bring food for Mr. Maccune
while they come to visit him in jail, they let him use their personal
cellular phone to call his wife and family.  The personal involvement
of judge Tagle can also be shown very easily.

"The personal involvement of a supervisory defendant may be shown
by evidence that:

(1)  the defendant participated directly in the alleged constitutional
violation, (2)  the defendant, after being informed of the violation
through a report or appeal, failed to remedy the wrong, (3)  the
defendant created a policy or custom under which unconstitutional
practices occurred, or allowed the continuance of such a policy or
custom, (4) the defendant was grossly negligent in supervising
subordinates who committed the wrongful acts, or (5) the defendant

27

exhibited deliberate indifference to the rights of [citizens] by
failing to act on information indicating that unconstitutional acts
were occurring." <u>Colon v. Caughlin</u>, 58 F.3d at 873.  Judge Tagle
can be attributed for prong(1), (4), (5).  Judge Tagle should have
hold an evidentiary hearing after Mr. Maccune's allocution as well
as defense attorney Sheldon Weisfeld's comment at the sentencing
hearing where he said in his 30 years of law practice he has never
seen such a defendant like Mr. Maccune he has done so much for the
government.

Mr. Maccune claims that it was Matt Mertinez who hancuffed and
threw him on the ground.  Agent Correy Nelson was laughing and mocking
Mr. Maccune when he was pleading for help when attacked by fire ants.
During questioning Matt Mertinez poked Maccune's belly several times
and used harsh voice in order to get information.  Both of the Agents
keep asking him questions without noticing that Maccune needed serious
medical attention. <u>See</u>, e.g., <u>Baskerville v. Goord</u>, 97 Civ. 6413,
1998 WL 778396 at *6 (S.D.N.Y. Nov.5, 1998) (summary judgement on
plaintiff's excessive force claim  where defendants were not "present
during or had any personal involvement with the alleged assault");
<u>Harvey v. New York City Policy Dep't</u>, 1997 WL 292112 at *1 (plaintiff's
... claims of excessive force ... must be dismissed as to individual
defendants ..., because plaintiff has adduced no evidence that any
of them were personally involved in any use of force against him");
<u>Pravda v. City of Albany</u>, 956 F.Supp. 174, 181-82 (N.D.N.Y.1997)
(summary judgement for administrative agency defendants because
"the complaint reveals that Plaintiff has not alleged any conduct
whatsoever on [their] part  ... that could form the basis of excessive
force claims against these Defendants" and summary judgement for
supervisory officers  because "PLaintiff does not allege any facts
from which the Court could reasonably infer that Defendants [supervisory

28

officers] participated in this alleged mistreatment, were present
when it allegedly occurred, knew about it, or were grossly negligent
in any way"); **Show v. Patterson**, 955 F.Supp. 182 (S.D.N.Y.1997)
(summary judgement for defendants on plaintiff' excessive force
claim where plaintiffs failed to submit evidence "indicat[ing]
any personal involvement by either of these defendants in the acts
alleged in plaintiffs' complaints.  Similarly, plaintiffs do not
allege any facts indicating that [defendants] created or were aware
of a prison policy of violating prisoners' rights by ... using
excessive force.  Finally, the complaints are devoid of any allegations
or implications that [defendants] supervised subordinates in a
grossly negligent manner"); **Wright v. Naranjo**, No. 94-CV-2461,
1996 WL 449276 at *4 (E.D.N.Y. Aug.1, 1996) (dismissing plaintiff's
excessive force claim against defendant in her individual capacity,
because plaintiff "fails to allege that [defendant] was personally
involved in the use of force against him").

It is extremely troubling (and horrible) what Mr. Maccune had
gone through the lives of county and city jails.  As a federal
inmate, he was supposed to be housed in a federal facility not
a state facility.  In some circuit this itself considered a basis
for downward departure.  Maccune was forced to withstand strong
cold while sleeping on the floor without the protection afforded
by mattress, jackets or blankets.  He had no hygiene and there
were mold on the food.  Agents Nelson and Mertinez used to bring
food for Maccune all the time.  That shows how bad and scanty the
foods were in those jails.
Maccune believes that his **EIGHTH AMENDMENT** rights have been violated
which is cognizable under **42 U.S.C. § 1983.**

## EIGHTH AMENDMENT VIOLATION
### Cognizable Under § 1983

The Supreme Court has held that an inmate must satisfy two requirements to demonstrate that a prison official has violated the Eighth Amendment. "First, the deprivation alleged must be, objectively, 'sufficiently serious'; a prison official's act or omission must result in the denial of 'the minimal civilized measure of life's necessities.'" **Id.** at 834, 114 S.Ct. at 1977 [1] (citations omitted). Second, "a prison official must have a 'sufficiently culpable state of mind'" **Id.**, 114 S.Ct. at 1977 [1]. In prison conditions cases, that state of mind is one of deliberate indifference to inmate health or safety. **See id.**, 114 S.Ct. at 1977 [1]. "To establish deliberate indifference ..., the prisoner must show that the defendants (1) were aware of facts from which an inference of an excessive risk to the prisoner's health or safety could be drawn and (2) that they actually drew an inference that such potential for harm existed." **Bradley v. Puckett**, 157 F.3d 1022, 1025 (5th Cir.1998).

Mr. Maccune has established the **'deliberate indifference'** requirements because both the Agents, U.S. Marshall,s office as well as prosecutor's know the terrible conditions of those jail facilities. Maccune begged Agent Nelson and Mertinez to move him and they keep moving him from one place to another. They wanted to break Maccune that way the weaker Mr. Maccune gets, the better it is for the government. This satisfied the first prong. All of the defendants knew the potential harm existed in those county jails. Government keep putting people in those kind of conditions in order to manipulate them. This is the **game** the government is playing. They will be keep playing and scoring the better points unless and until a better opposition team comes along. Hence, without a shreaded doubt, the second prong has been satisfied very clearly.

-30-

This court has observed that "certain prison conditions [are] so base, inhuman and barbaric' that they violate the Eight Amendment." **Novak v. Beto**, 453 F.2d 661, 665 (5th Cir.1971).  One such condition is "the deprivation of basic elements of hygiene."  Maccune claims that he could not use the bathroom during the first twenty-four-hour he was in jail because the human waste was still there with flies humming.  In the next two days he was not allowed to use a bathroom by the inmates who were Mexicans and Maccune was the only 'white male' in the cell.  Since he was a federal pre-trial detainee, the government is responsible for all deprivation because Maccune remined both Nelson and Mertinez about his living conditions over and over again.  He also earned a **'cry-baby'** nickname from the jail guards.  The defendants may suggest that Maccune's experience was no different than that of many overnight campers and, relying on **Smith v. Copeland**, 87 F.3d 265 (8th Cir.1996), argue that the lack of toilet facilities did not implicate constitutional concerns. In **Smith,** a pretrial detainee claimed that he was forced to endure raw sewage because an overflowed toilet in his cell was not cleaned for four days.  The detainee did not dispute that he declined to flush the toilet or clean the mess.  The **Smith** court acknowledge that exposure to raw sewage may constitute cruel and unusual punishment in some cases, but concluded that the totality of the circumstances in that case did not amount to a constitutional violation. **Id.** at 268-69.·

However, persuasive **Smith** may be, it is unlike the case at bar, which involves a complete deprivation of toilets for scores of inmates confined in the same small area.  Any court should find that these conditions constitutes a **"deprivation of basic elements of hygiene."**

1. **Farmer v. Brennan,** 511 U.S. 825, 832, 114 S.Ct. 1970, 1976, L.Ed.2d 811 (1994).

"Prisoners have a right to protection from extreme cold."
Dixon v. Godinez, 114 F.3d 640, 642 (7th Cir.1997); see Murphy
v. Walker, 51 F.3d 714, 721 (7th Cir. 1995) (noting that a pretrial
detainee has a right to adequate heat and shelter); Beck v. Lynaugh,
842 F.2d 759, 761 (5th Cir.1988) (holding that a prisoner's allegations
of exposure to the elements during winter months stated a cause
of action under the Eighth Amendment); see also Bienvenu v. Beauregard
Parish POlice Jury, 705 F.2d 1457, 1460 (5th Cir. 1983) (per curiam)
(finding that a plaintiff's statements that the defendant "intentionally
subjected him to a cold, rainy, roach-infested facility and furnished
him with inoperative scum-encrusted washing and toilet facilities
sufficiently alleges a cause of action cognizable under 42 U.S.C.
§ 1983 and the eighth and fourteenth amendments").

Although the degree to which the temprature actually fell making
the jail cell as cold and bitter as possible, no toothpaste and
brush, mold in the food, crowded inmates as chickens, earning nicknames
as 'cry baby', 'snitch', are relevant to a conclusive determination;
Maccune's description of the incident suggests that his exposure
to the elements may have risen to the level of a constitutional
deprivation.  As Maccune emphasize, the challenged conduct lasted
12 months.  In addition to duration, however, the court must consider
the totality of the specific circumstances that constituted the
conditions of·Maccune's confinement, with particular regard  for
the manner in which some of those conditions had a mutually enforcing
effect.  See Wilson v. Seiter,.501 U.S. 294, 304, 111 S.Ct. 2321,
2327, 115 L.Ed.2d 271 (1991); cf.  Dixon v. Godinez, 114 F.3d 640,
643 (7th Cir.1997) (observing that "most successful Eighth Amendment
claims often involve allegations of cold in conjunction with other
serious problem"); McCray v. Burrell, 516 F.2d 357, 356-68 ⸱⸱⸱⸱

(4th Cir.1995) (finding Eighth Amendment violation where inmate
was solitarily confined fot forty-six hours in a cold cell with
no clothing or blankets, no running water or personal hygiene items,
and a toilet consisting of an excrement-encrusted hole in the floor).
We find that the totality of the specific circumstances presented
by Palmer's claim-his overnight outdoor confinement with no shelter,
jacket, blanket, or source of heat as the temperature dropped and
the wind blew along with the total lack of bathroom facilities
for forty-nine inmates sharing a small bounded area-constituted
a denial of "'the minimal civilized measure of life's necessities.'"
**Farmer v. Brennan**, 511 U.S. 825, 834, 114 S.Ct. 1970, 1977, 128
L.Ed.2d 8111 (1994) (citation omitted).

Having demonstrated a sufficiently serious deprivation, Maccune
must establish that Agent Nelson and Mertinez acted with deliberate
indifference to his health or safety.  According to Maccune, both
Agents knew the horrible conditions and times Maccune was going
through.  Maccune also asserts that, at least **10 times** both Agents
and prosecutors threatened Maccune about the situation will get
even worst if he 'doesn't cooperate.'  **See, e.g., id., 114 S.Ct.
at 1976.**  More specifically, this court had already made it clear
that a prison official may not subject inmates to significantly
cold temperatures or deprive them of the basic elements of hygiene.
See, e.g., **Bienvenu v. Beauregard Parish Police Jury**, 705 F.2d
1457 (5th Cir.1983) (per curiam); **Daigre v. Maggio**, 719 F.2d 1310,
1312 (5th Cir.1983) ("We concluded over a decade ago that the eighth
amendment forbids deprivation of the basic elements of hygiene.");
**Novak v. Beto**, 453 F.2d 661, 665 (5th Cir.1971); cf.  **Chandler
v. Baird**, 926 F.2d 1057, 1065-66 (11th Cir.1991) ("[T]he right
of a prisoner not to be confined in a cell at so low a temperature

as to cause severe discomfort and in conditions lacking basic sanitation
was well established in 1986.").

## ELEVENTH AMENDMENT BAR:

The Eleventh Amendment bars claims against the various named
defendants in their official capacities as officers.  See **Farid
v. Smith**, 850 F.2d 917, 921 (2d Cir.1988).  The Eleventh Amendment
does not, however, prevent Danny Maccune from suing those defendants
in their individual capacities.  See **Id.**  Accordingly, although
the claims against these defendants in their official capacities
'may be' dismissed, the claims against them in their individual
capacities require further discussion.

## QUALIFIED IMMUNITY

In **Berger v. Hanlon**, 129 F.3d 505 (9th Cir.1997) the court
noted: ".....  The **Berger** claim that the federal appellees, AUSA
Kris Melean and USFWS Special Agents Rodney C. Hanlon, Joel Scrafford...
are individually liable for damages caused by their active participation
in .......the Berger contend that the resulting search violated
their Fourth Amendment right against unreasonable searches and seizures.
We hold they are correct and that the federal officers **are not
entitled to qualified immunity.**

Regardless of whether a constitutional violation has occurred,
the federal appellees are, of course, entitled to qualified immunity
if they could reasonably have believed that their conduct violated
no clearly established federal statutory or constitutional rights.
See **Harlow v. Fitzgerald**, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738,
73 L.Ed.2d 396 (1982); **Shoshone-Bannock Tribes v. Fish & Game Comm'n**,
42 F.3d 1278, 1285 (9th Cir.1994).

Qualified immunity exists insofar as defendants' "'conduct
does not violate clearly established statutory or constitutional

law of which a reasonable person would have known.'" **Elliott v.
Cheshire County**, 940 F.2d 7, 10 (1st Cir.1991) (quoting **Harlow
v. Fitzgerald**, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)).
The requirements are two fold in the sense that:  (1) a clearly
established statutory or constitutional law must exist at the time
of the conduct in question; and (2) a reasonable official would
have known that his conduct violated this right.  **Frazier v. Bailey**,
957 F.2d 920, 928 (1st Cir.1992) ( stating that **Harlow** requires
examination of these two issues).  Stated otherwise, federal officials
may avoid liability for monetary damages under section 1983 "by
showing either that they did not violate a right clearly established
under federal law or that thay acted with objective legal reasonableness."
**Camilo-Robbs  v. Hoyos**, 151 F.3d at 5.  Thus, even when rights
are clearly established, "qualified immunity protects a government
official 'if it was objectively reasonable for the official to
believe that his acts did not violate those rights." **Russell v.
Coughlin**, 910 F.2d 75, 78 (2dCir. 1990).  The relevant question
"is whether the allegedly violated federal right was established
with sufficient clarity that a reasonable government functionary
should have conformed his conduct accordingly." **Camilo Rubbs v.
Zapata**, 175 F.3d 41, 1999 WL 223051 at *2 (1st Cir. April 20,1999).

The qualified immunity defense leaves"'" ample room for mistaken
judgments" by protecting "all but the plainly incompetent or those
who knowingly violate the law."'" **Rivera v. Muphy**, 979 F.2d 259,
263 (1st Cir.1992) (quoting **Hunter v. Bryant**, 502 U.S. at 229,
112 S.Ct. 534 quoting **Malley v. Briggs**, 475 U.S. 335, 106 S.Ct.
1092, 89 L.Ed.2d 271 (1986)).
Reasonable errors therefore do not remove an official's conduct
from the protection afforded by the defense.  **See Rivera**, 979 F.2d
at263 n.1.

**Buckley v. Rogerson**, 133 F.3d 1125, 1127, 1129 (8th Cir.1998)
(official has burden of proving qualified immunity); **Johnson-EL
v. Schoemehl**, 878 F.2d 1043, 1048 (8th Cir.1989) (official asserting
qualified immunity has burden of proving any "extraordinary circumstances")

The court focuses on the individually named defendants' claims
of qualified immunity out of a concern for judicial efficiency,
since their entitlement to qualified  immunity is(may be) obvious,
while the issue of absolute immunity is a **policy-laden** question
and their entitlement is not at all clear.

The court is not unmindful that one of the purposes of absolute
immunity is to prevent individuals associated with a judicial or
quasi judicial process from having to question the way they use
their necessarily broad discretion.  **Ernst v. Child and Youth Services
of Chester County,** 108 F.3d 486, 496-97 (3d Cir.1997).  It is also
aware that by not considering absolute immunity at this juncture,
it may force the individually named defendants to carry out their
roles in the police disciplinary process while looking over their
shoulders.  On the other hand, another consideration the court
would have to consider in making the absolute immunity determination
is existence of other avenues through which to supervise the conduct
of the defendants and safeguard the rights of the people whom their
exercise of discretion might affect.  **Butz,** 438 U.S. 478, 515,
98 S.Ct. 2894, 57 L.Ed2d 895 (1978).  In this case, a grant of
absolute immunity might all but eliminate any possibility of redressing
the types of flagrant constitutional abuses not shielded by qualified
immunity.  Accordingly, absolute immunity is far from assured for
the individually named defendants.  **See Buckley v. Fitzsimmons,**
509 U.S. 259, 268, 113 S.Ct. 2606, 125 L.Ed.2d 209 (1993) (actions
performed by prosecutor in his role as an advocate for the state

36-

are entitled to absolute immunity); <u>Kalina v. Fletcher</u>, 522 U.S. 118 S.Ct. 502,
510, 139 L.Ed.2d 471 (1997) (Scalia,J., concurring) (absolute immunity for
the decision to seek an arrest warrant after filing an information); <u>Imbler</u>
<u>v. Pachtman,</u> 424 U.S. 409, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976) (absolute immunity
for initiation of prosecution); <u>Barr v. Abrams,</u> 810 F.2d 358, 362 (2d Cir. 1987)
(absolute immunity for procuring arrest warrant).

Prosecutorial immunity is, if anything, even broader under state law than
it is under federal law. A prosecutor receives <u>only</u>" qualified immunity from
§ 1983 claims.

Maccune argues that Defendants Matt Mertinez , Correy Nelson, Mark Dowd,
Ms. Kowalski-Garza, Judge Hidla G. Tagle are not eligible and entitled for qualified
immunity. All of them violated Maccune's constitutional rights. Qualified
immunity may save them from liability in their official capacities but they
are sill responsible for damages caused by them in their individual capacities.
Defendants acted maliciously and their <u>intentions</u> were <u>ill motivated</u> from the
beginning. Ironically, they are still doing the same <u>coward acts</u> hoping they
are shielded by their powers and politics. Maccune tries to send a message
to the Defendants that <u>'good days'</u> are over. Qualified immunity will not <u>save</u>
you, it will <u>sink</u> you.

<u>STANDARD OF REVIEW</u>

" [A] complaint should not be dismissed for failure to state a claim unless
it appears beyound doubt that the plaintiff can prove no set of facts in support
of his claim which would entitle him to relief." <u>Conley v. Gibson</u>, 355 U.S.
41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957).

Mr. Maccune has clearly stated nine claims. All of them are constitutional
violations. Government will file their brief denying all the claims and facts.
Maccune respectfully requests this court to be mindful of "society's stronger
interest is in punishing appropriately an unrepentant criminal."
<u>United States v. McDonald</u>, 991 F.2d 866, 872 (D.C.Cir. 1993).

Mr. Maccune felt sorry for his involvement in the drug transaction.
One of the reason motivated him to cooperate with the government to the fullest
extent was that he wanted to repent.  He did his part what was promised from
him to the government but he did not receive what was promised to him.

The doctrine of qualified immunity shields a state official from personal
liability for damages under 42 U.S.C. § 1983 when the official's exercise of
discretionary authority results in a violation of an individual's federal consti-
tutional or statutory rights, "unless at the time and under the circumstances
of the challenged conduct all reasonable officials would have realized that
it was proscribed by the federal law on which the suit is founded." Pierce
v. Smith, 117 F.3d 866, 871 (5th Cir.1997).  The bifurcated test for qualified
immunity asks whether the plaintiff has alleged a violation of a clearly established
right and, if so, whether the defendant's conduct was objectively unreasonable.
See Hare v. City of Corinth, 135 F.3d 320, 325 (5th Cir.1998).  Currently applicable
constitutional standards govern the first prong of the analysis.  See Id. at
326.  The second prong involves "two seperate inquiries:  Whether the allegedly
violated constitutional rights were clearly established at the time of the incident;
and, if so, whether the conduct of the defendants was objectively unreasonable
in the light of that then clearly established law."  Id. at 326 (citation omitted).

Maccune argues that Defendants violated his rights under the EIGHTH AMENDMENT
whereas the appellants may argue that the conditions Maccune experienced, the
suffering his families had went through, the lies the Agents and prosecutors
had told him and the damages the defendants had inflicted on him do not rise
to the level of a constitutional violation.  Although the constitution "does
not mandate comfortable prisons," Rhodes v. Chapman, 452 U.S. 337, 349, 101
S.Ct. 2392, 2400, 69 L.Ed.2d 59 (1981), conditions of confinement "must not
involve the wanton and unnecessary infliction of pain."  Id. at 347, 101 S.Ct.
at 2399.  The Eighth Amendment prohibits against cruel and unusual punichment.

The court should deny the qualified immunity of all the defendants and held
them completely liable for their misdeeds, gross negligence and abuse of power.
The court should not protect the defendants anymore.

## DENIAL OF QUALIFIED IMMUNITY

Under the collateral order doctrine, however, a district court's denial
of qualified immunity on a motion for summary judgement is immediately appealable
if it is based on a conclusion of law.  See Johnson v. Jones, 515 U.S. 304,
115 S.Ct. 2151, 132 L.Ed.2d 238 (1995); Mitchell v. Forsyth, 472 U.S. 511, 105
S.Ct. 2806, 86 L.Ed.2d 411(1985) such orders are not appealable if they are
based on a claim regarding the sufficiency of the evidence.  See Naylon v. State
of Louisiana, Dep't. of Corrections, 123 F.3d 855, 857 (5th Cir.1997)(per curiam):

Thus, orders denying qualified immunity are immediately appealable only
if they are predicated on conclusions of law, and not if a genuine issue of
material fact precludes summary judgement on the question of qualified immunity.
Stated another way, we have jurisdiction over law-based denials of qualified
immunity, but do not have jurisdiction over a genuine-issue-of-based denial
of qualified immunity.

Id.  See Johnson, 515 U.S. at 313, 115 S.Ct. at 2156 (holding that district
court's summary judgement order denying qualified immunity is not immediately
appealable when the decision "determines only a question of 'evidence sufficiency,'
i.e., which facts a party may or may not, be able to prove at trial.").  Therefore,
if the district court concludes that the summary judgement record raises a genuine
issue of material fact with respect to whether the defenseof qualified immunity
is applicable, then that decision is not immediately appealable under the collateral
order doctrine.  See Petta v. Rivera, 143 F.3d 895, 898 (5th Cir.1998).

In the present case, the district court should deny the qualified immunity
and liability of the defendants on the basis that the alleged conduct of Agents-
-, prosecutors-,-, and judge Tagle violated Maccune's constitutional rights
and was objectively unreasonable.  To the extent this determination involves

-39-

a question of law, as opposed to an assessment of the facts established by or
inferable from the evidence, but the 5th circuit court of Appeal will not review
in this connection the district court's assessment of what facts are established
by or inferable from the evidence.

## FIRST AMENDMENT VIOLATION
### Cognizable Under § 1983

The First Amendment right of access to the courts protects an individual's
right to petition the government for redress of grievances.  **Californial Motor
Transport Co. v. Trucking Unlimited**, 404 U.S. 508, 514, 92 S.Ct. 609, 30 L.Ed.2d
642 (1972).  This right "assures that no person will be denied the opportunity
to present to the judiciary allegations concerning violations of fundamental
constitutional rights."  **Wolff v. McDonnell**, 418 U.S. 539, 579, 94 S.Ct. 2963,
41 L.Ed.2d 935 (1974).  "The right of access, in its 'most obvious and formal
manifestation ... protects one's physical access' to the courts."  **Foster v.
City of Lake Jackson,** 28 F.3d 425, 429 (5th Cir.1994), citing **Crowder v. Sinyard,**
884 F.2d 804, 811 (5th Cir.1989), Cert. denied, 496 U.S. 924, 110 S.Ct. 2617,
110 L.Ed.2d 638 (1990).

Maccune concludes that Agents Mertinez, Nelson and AUSA Ms. Kowalski-Garza
prevented him before the sentencing hearing not to let the court know about
their promises.  Government did not want Maccune to disclose misconduct on the
record.  Before the judge came on the stands, Agents told Maccune that everything
will be fine and he will be out pretty soon.  Ms. Garza, on the other hand,
had done completely different than what she had told Maccune before.

## ABUSE OF PROCESS VIOLATION
### Cognizable Under § 1983

A claim for abuse of process requires the following elements:  "(1) that
the defendant made an illegal, improper, perverted use of the process; (2) that
the defendant had an ulterior motive or purpose in exercising such illegal,
perverted, or improper use of process; and (3) that damage resulted to the plaintiff

CUtePDF - www.cutepdf.com

from the irregularity." **Detenbeck v. Koester**, 886 S.W.2d 477, 480 (Tex.App.-
Houston [1st Dist.] 1994, no writ).  Such a claim requires that the process
be used "to accomplish an end which is beyound the purview of the process, and
which compels a party to do a collateral thing which he would not be compelled
to do." **Id.** at 480.  The tort compensates a plaintiff when process is used
against him for a collateral purpose, such as obtaining property or the payment
of money-something which is not the proper subject of the proceeding itself.
If the process is used for the purpose for which it was intended, "even though
accompanied by an ulterior motive, no abuse of process occurs." **Id.** See also
**In Re Burzynski**, 989 F.2d 733, 739 (5th Cir.1993).  Without a showing that the
use of the process itself was illegal, a claim for abuse of process must be
dismissed.  In **Re Burzynski**, 989 F.2d at 739.

Maccune has presented ample evidence to establish that the process used
or issued in this case was illegal or otherwise improper.  The process the
defendants had used was to get **'anything of value'** they wanted for their selfish
use from Mr. Maccune by telling him lies, promises which they knew that they
won't be able to fullfil.  They violated § 201 by letting Maccune testify at
court against his co-defendant.  When the codefendant got convicted suddenly
Maccune is no longer a government's key witness, he is just another name on
the list.  This practice should be stopped and it is illegal.

"[T]here is no liability where the defendant has done nothing more than
carry out the process to its authorized conclusion, even though with bad intentions."
**Detenbeck**, 886 S.W.2d at 480 (internal quotations omitted).  Maccune has presented
ample evidence that Agents Nelson and Mertinez had no authority to tell Maccune
that he will be placed under Federal Witness Protection Program if that decision
had to be done through the court.  So the Agents went too far in their power.
Hence, it is evident that the government had an improper motive in promising
Maccune.

## VIOLATION OF FOURTEENTH AMENDMENT CLAIM, CLAIM
## NO. TWO COGNIZABLE UNDER SECTION 1981

The equal Protection Clause of the Fourteenth Amendment demands that no
state shall "deny to any person within its jurisdiction the equal protection
of the laws," which, according to the Supreme Court, is "essentially a discretion
that all persons similarly situated should be treated alike." **City of Cleburne
v. Cleburne Living Center,** 473 U.S. 432, 439, 105 S.Ct. 3249, 87 L.Ed.2d 313
(1985) (citation omitted). Once similarly situated classes are identified,
the level of scrutiny to be applied to a facially neutral law, such as this
legislation, depends upon whether the statue impinges on a fundamental right
or involves a suspect classification. See **Shapiro v. Thompson,** 394 U.S. 618,
89 S.Ct. 1322, 22 L.Ed.2d 600(1969). To establish that a law is racially discriminatory
in violation of the equal Protection Clause, the invidious quality of a law
must ultimately be traced to a racially discriminatory purpose. **Washington
v. Davis,** 426 U.S. 229, 240, 96 S.Ct. 2040, 48 L.Ed.2d 597(1976). **See** also
**Ricketts v. City of Hartford,** 74 F.3d 1397, 1407 (2d Cir.1996) ("It is well
established that a claimant under the Fourteenth Amendment's Equal Protection
Clause ..... must establish intentional discrimination.") This finding requires
a "sensitive inquiry into such circumstantial and direct evidence of intent
as may be available." **Arlington Heights v. Metropolitan Housing Development
Corp.,** 429 U.S. 252, 266, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977). Subjects of
proper inquiry in determining whether racially discriminatory intent existed
include the impact of the official action, whether it "bears more heavily on
one race than another," **Washington v. Davis,** 426 U.S. at 242, 96 S.Ct. 2040,
the historical background of the decision, particularly if it reveals a series
of official actions taken for invidious purposes, the specific sequence of events
leading up to the challenged decision, departures, particularly substantive
ones, from the normal procedural sequence, and the legislative history, especially
where there are contemporary statements made by members of the decision-making
body, minutes of its meetings, or reports.

Arlington Heights, 429 U.S. at 266-68, 97 S.Ct. 555.  In making this sensitive
inquiry, it is important to note that the legislature is presumed to act constitut-
ionally, see Butts v. City of New York, 779 F.2d 141, 147 (2d Cir.1985)
(citation omitted), and "courts should be 'reluctant to attribute unconstitutional
motives to the state, particularly where a plausible [constitutional] purpose
may be discovered from the face of the statute.'"  Id. (brackets in the original).
Strict scrutiny is triggered only if and when a plaintiff satisfies its proof
of racial animus.  Washington v. Davis, 426 U.S. at 242, 96 S.Ct. 2040.

Agents used racial epithets in conversing with Maccune.  The use of an
epithet is strong evidence that a comment or action is racially motivated.
May be the city people does not like the country people, as Maccune being grow
up in the country.  Other circuits have interpreted Fifth circuit's opinion
in Johnson, 876 F.2d 482 to stand for the principle that racial epithets coupled
with harassment are sufficient to support a cause of action under the Equal
Protection Clause.  Simmons v. O'Brien, 77 F.3d 1093, 1094 n. 2 (8th Cir.1996);
Smith v. Thornburg, 136 F.3d 1070, 1089-90 (6th Cir.1998) (Clay, J., dissenting).
The Fifth circuit has been hesitant to conclude, however, that the use of racial
epithets alone are sufficient to assert a cause of action under the Fourteenth
Amendment.  In an earlier case, Ware v. Reed, 709 F.2d 345, 352 (5th Cir.1983)
the Fifth Circuit declined to address this "thorny" issue, noting instead that
epithets alone may not be sufficient:

Query whether the use of such language, rancid and denigrating as it certainly
is, standing alone, amounts to the kind of violation contemplated by the Fourteenth
Amendment Equal Protection Clause and entitled to redress under § 1981.  Compare
Howard v. National Cash Register Co., 388 F.Supp. 603 (S.D.Ohio 1975) and Johnson
v. Hackett, 284 F.Supp. 933 (E.D.Pa.1968) with Harris v. Harvey, 605 F.2d
330, 338 (7th Cir,1979) (collecting cases) and City of Minneapolis v. Richardson,
307 Minn. 80, 239 N.W.2d 197, 200 (1976); Cf. Exparte Hamilton, 376 U.S. 650,
84 S.Ct. 982, 11 L.Ed2d 979 (1964) (per curiam); Allen v. City of Mobile, 331
F.Supp. 1134, 1150 (S.D.Ala.1971), affd, 466 F.2d 122 (5th Cir.1972) (per curiam)

(personnel in the police department instructed to refrain from the use of racially derogatory words); **see generally Delgado, Words That Wound:  A Tort Action for Racial Insults, Epithets, and Name Calling, 17 Harv.C.R.-C.L.L.Rev. 133, 159-65 (1982). Id. at n. 12.)**

Mr. Maccune's constitutional rights have been violated numerious times.  When he was fearful for his life in the county jail, he informed Matt Mertinez, Nelson, Dowd and his attorney. They keep moving him from one place to another place.  Agents used to refferred him as **'county boy'** and they thought since Maccune is less educated, has no knowledge of law they can do anything to him.  Agents and the prosecutors took advantage of Maccune's social, economical and political situation. .They discriminated against him because they thought 'they can get by with it very easily.'  Maccune put all his trust on them, has done everything he could to please and substantially help the government but instead they played him real dirty.

They used racial comments many many times.  Agents use of a racial epithet with harassment or some other conduct that deprives the victim of established rights does amount to an equal protection violation. The question in the equal protection context, however, is not just whether the conduct is racially motivated but also whether that action deprives a person of "equal protection of the laws." **U.S. Cont. amend. XIV.**  There are lots of objectionable conduct on Nelson and Mertinez's part. Agents used to tell Maccune that if he cooperate fully he will be siting with his family rather than **rot** in prison.  Their conduct definitely rises to the level of harassment.

Conditions of confinement claims brought by pre-trial detainees at county jails are evaluated under the Due Process

-44-

CHAPDF - www.fadso.com

Clause of the Fourteenth Amendment, **Bell v. Wolfish**, 441 U.S. 520, 534-35, 99 S.Ct. 1861, 1871-72, 60 L.Ed.2d 477 (1979), while those brought by convicted prisoners are evaluated under the Eighth Amendment.  The rights of a pre-trial detainee are at least as great as those afforded to convicted felons, and accordingly, Eighth Amendment jurisprudence is often utilized to evaluate claims regarding conditions of confinement whether they be brought by pre-trial detainees or prisoners.  **Payne v. Churchich**, 161 F.3d 1030, 1041 (7th Cir.1998); **Mathis v. Fairman**, 120 F.3d 88, 91 n. 3 (7th Cir.1997); **Zarnes v. Rhodes**, 64 F.3d 285, 289 (7th Cir.1995) (pretrial detainees retain at least those constitutional rights that are enjoyed by convicted prisoners).

Consequently, a prison official violates either the Eighth Amendment or the Due Process Clause of the Fourteenth Amendment when he is deliberately indifferent to sudstantial risk of serious harm to an inmate, and a finding of deliberate indifference requires evidence that the official was aware of the risk and consciously disregarded it nonetheless.  **Payne**, 161 F.3d at 1041 ("A detainee establishes a § 1983 claim by demonstrating that the Defendants were aware of a sudstantial risk of serious injury to the detainee but nevertheless failed to take appropriate steps to protect him from a known danger."); **Mathis**, 120 F.3d at 91 (citing **Farmer**, 511 U.S. at 840-42, 114 S.Ct. 1970, 1980-81, 128 L.Ed.2d 811).

### TORTIOUS INTERFERENCE
### Cognizable Under 28 U.S.C. §§ 1346, 2671-80
### CLAIM NO. 5

It is hornbrook law that the United States as a Sovereign nation, is immune from suit except to the extent that the United

States has contented to be sued.  **McNeily v. United States,**
**6 F.3d 343, 347 (5th Cir.1993).**  "One of the vehicles by which
the United States has commented to be sued is the Federal Tort
Claims Act, 28 U.S.C. §§ 1346, 2671-80."  **Id.**  The FTCA waives
the sovereign immunity of the United States, making it liable
in tort "in the same manner and to the same extent as a private
individual under like circumstances." 28 U.S.C. § 2674.  The
United States is liable for damages caused:

by the negligent or wrongful act or omission of any employee
of the government while acting within the scope of his office
or employment under circumstances where the United States, if
a private person, would be liable to the claimant in accordance
with the law of the place where the act or omission occurred.
28 U.S.C. § 1346(b).

**Certification, under § 2679(d)(1),** if the Attorney General certifies
that a federal employee was acting within the scope of his office
or employment  at the time of the incident out of which a state
law claim arises, a civil action arising out of such incident
shall be deemed an action against the United States, and the
United States shall be substituted as the sole defendant with
respect to those claims.  The authority for making such a certifi-
cation has been delegated by the Attorney General to the Assistant
Attorney General in charge of the Civil Division.  28 C.F.R.
§ 153 (1996).  The Assistant Attorney General in charge of the
Cvil Division has redelegated certification authority to directors
of the Tort Branch.  Appendix to 28 C.F.R. § 153 (1996).

In this claim Mr. Maccune asserts that government has
done two violations:

(1) fraud (of artifice and concealment)

(2) tortious interference with contract.

-46-

## FRAUD

Mr. Maccune will address this two issues one by one.  First
Maccune asserts a claim for fraudulent concealment.  Agents
Mertinez, Nelson and prosecutors Dowd, Ms. Garza never ever
revealed to Maccune that his placement on the **Federal Witness**
**Protection Program** depends on the whim of the government or
the special performance of Maccune or to testify against each
and every criminal defendants prosecuted in Browsville division
for the Southern district of Texas or rests completely on the
discretion of the court or the U.S. Marshall's **Apple picking**
**season** to pick and choose whomever they want.  These four defendants
come up with an artifice to promise Maccune while all of them
knew the promise is not true.  Their intentions were bad from
the beginning.  Their artifice was to let Maccune know how helpfull
and serious they were by advising him to relocate his family
and by paying $2,800 as a sign of uncle  Sam's Money Bank.
They even told him that all of their social security numbers,
dates of birth will be changed.

     In Texas fraud is deducible from both artifice and conceal-
ment. -See **41 Tex. Jur. 3d Fraud and Deceit §§ 14, 55 (west**
**1998).**  Under firmly settled and oft confirmed Texas law, "the
elements of fraud are" that:  (1) "a material misrepresentation"
was made;  (2) "[it] was false," (3) "the speaker [knew it]
to be false when made, or ... [made it] without knowledge of
the truth;" (4) "[the misrepresentation] was intended to be
acted upon;" (5) "[it] was relied upon;" and (6) "[it] caused
injury" to the relying party.  **DeSantis v. Wackenhut Corp.,**
793 S.W.2d 670, 688 (Tex.1990) (citing Stone v. Lawyers Title
Ins. Corp., 554 S.W.2d 183, 185 (Tex.1977); accord **Oppenheimer**

v. Prudential Sec Inc., 94 F.3d 189, 194 (5. Cir.1996) (citing
DeSantis); Trenholm v. Ratcliff, 646 S.W.2d 927, 930 (tex.1983)
(citing Wilson v. Jones, 45 S.W.2d 572, 573 (Tex.Com. App.1932),
holding app'd); Oilwell Div., U.S. Steel Corp. v. Fryer,493
S.W.2d 487 (Tex.1973) (citing Wilson). Furthermore, [f]raud
is deducible from artifice and concealment as well as from affirmative
conduct of a character such as tends to deceive.  If there is
a duty to speak, fraud may be found in the concealment of a
material fact.  If a person sustains toward another a position
of trust and confidence, his failure to disclose facts that
it is his duty to disclose is as much fraud as would be actual
misrepresentation of true facts.  That is to say, fraud may
exist where there is a concealment of a material fact that should
be divulged, as well as where there is a positive misrepresentation
of a material fact.

Anderson v. Anderson, 620 S.W.2d 815, 819 (Tex.Civ.App.1981,
no writ) (citing 25 Tex.Jur.2d Fraud and Deceit § 35).  In addition,
10 Tex.Jur.3d Cancellation and Rescission § 16-Concealment of
a Material Fact (West 1997), states that [w]here the particular
circumstances impose on a person a duty to speak and such person
deliberately remains silent, the silent is equivalent to a
false representation.  That is to say, where a special relationship
of confidence exists, the concealment of a fact that one is
bound to disclose, being the equivalent of an indirect representation
that the fact does not exist, differs from adirect false statement
only in the manner in which it is made.

(footnotes omitted).

     In Texas, to successfully cancel a contract on the ground
of fradulent concealment, a plaintiff must prove an intentional

-48-

CUTePDF - www.fasrio.com

suppression of a fact that the defendant is under a duty to
disclose.  See Hansen v. Christie, 132 S.W.2d 910 (Tex.Civ.App.1939);
41 Tex.Jur.3d Fraud & Deceit §14 (West 1998).  Thus,  where
proof is proffered that the defendant deliberately concealed
from the plaintiff materials facts that were integral to the
plaintiff's understanding of the consequences of entering into
the agreement, a contract may be canceled.  See Long v. Martin,
S.W. 91  (Tex.Civ.App.1921, writ dism'd); 10 Tex.Jur.3d Cancellation
and Rescission § 16 (West 1997).

        In addition, to determine whether a contract was procured
by fraud, a court may properly consider the transaction as a
whole, including the nature of the transaction, the extent of
the consideration, the relationship and interests of the parties,
the respective ages of the parties, the extent of defendant's
effort to perform, and all other relevant circumstances.
Anderson, 620 S.W.2d at 819 (citing 37 C.J.S. Fraud § 119 (1943)).
"Mere silence, however, may not amount to fraudulent concealment
where it is shown that the parties dealt at arms-lenght, no
special relationship of confidence existed between them, the
sources of information were equally available to both, and no
inquiry was made."  10 Tex.Jur.3d Fraud § 16 (footnotes omitted).

        A party asserting a plea of fraudulent concealment "has
the burden to show not only that the defendant actually knew
that a wrong had occurred, but also that the defendant purposefully
concealed the wrong." Nash v. Caolina Cas. Ins. Co., 741 S.W.2d
598, 602 (Tex.Civ.App.1987, writ denied); see Dotson v. Alamo
Funneral Home, 577 S.W.2d 308, 311 (Tex.Civ.App.1979, no writ).
In addition, allegations of fraud "must always be proved by
clear and convincing evidence". Saenz v. Kenedy, 178 F.2d 417,

                              -49-

419 (5th Cir.1945, (quoting <u>Loew's, Inc. v. Lays</u>, 209 F.2d 610, 614 (5th Cir.1954)).  Thus, to defeat a motion for summary judgment on a fraud claim, the non-moving party must make a showing sufficient to establish the existence of "a misrepresentation of a material fact." <u>James v. Nico Energy Corp.</u>, 838 F.2d 1365, 1372 (5th Cir.1988).

## MISREPRESENTATION

A misrepresentation may be material if it induced the complaining party to enter the contract.  See <u>Marburger v. Seminole Pipeline Co.</u>, 957 S.W.2d 82, 86 n. 4 (Tex.App.1997, writ denied). "Statements of fact may be actionable misrepresentations." <u>Ryan v. Glenn</u>, 489 F.2d 110, 112 (5th Cir.1974).  Statements of opinion, however, as to future or contingent events, to expectations or probabilities, or as to what will or will not be done in the future, are not actionable.  See id. at 114.  Misrepresentations must relate to a present fact, and "the element of futurity prevents what was said from being actionable." <u>Id.</u>; see also <u>Maness v. Reese</u>, 489 S.W.2d 660, 663 (Tex.App.1972, writ ref'd n.r.e.) (stating that future predictions and opinions do not serve as a basis for actionable fraud); <u>Griffin v. H.L. Peterson Co.</u>, 427 S.W.2d 140, 144 (Tex.Civ.App.1968, no writ) (concluding same in finding that predictions of the values of a silo in a dairy operation were mere opinions or prophecies as to future or contingent events, and not misrepresentations as to material existing facts).

Similarly, statements that can be categorized as "puffing" and "trade-talk" are not assurances of fact, and, thus, "do not amount to actionable misrepresentations where the parties deal at arms-lenght and have equal means of information." <u>Ryan</u>,

489 F.2d at 113.  In addition, "[b]efore a promise to do something
in the future  can be actionable fraud, plaintiff must additionally
plead and prove that at the very time the promise was made, [the defen-
dant] did not intend to carry it out."  **Brooks v. Parr, 507 S.W.2d
818, 819-20 (Tex.Civ.App.1974, no writ)** (citing **Urso v. City of Dallas,
221 S.W.2d 869, 872 (Tex.Civ.App.1949, writ ref'd)**).

In this case, Maccune alleges that certain verbal and written
statements, made by defendants, are **"facts."**  Under **brooks and Griffin,
defendant's** predictions of the future, however, which were believed
when made, cannot serve as a basis for a fraud claim just because
they subsequently did not come to fruition.  But in Maccune's case
the evidence shows clearly that defendants did not intend to carry
out their future predictions at the very time that they were made,
which is essential in proving the engage element of the actionable
misrepresentation.  **See Brooks, 507 S.W.2d at 820.**  Thus, these alleged
assurance of facts clearly support the fraudulent concealment claim.

## DUTY TO DISCLOSE

Under established Texas law, no duty to disclose exists "if
there is no confidential or fiduciary relation between the parties."
**Southwest E & T Suppliers, Inc. v. American Enka Corp., 463 F.2d 1165,
1166 (5th Cir.1972)**; accord **Bay Colony, Ltd. v. Trendmarker, Inc.,
121 F.3d 998, 1004 (5th Cir.1997)** ("Texas law recognizes a duty to
disclose only where a fiduciary or confidential relationship exists.");
see **Borderlon v. Peck, 661 S.W.2d 907, 908 (Tex.1983)** (stating that
relationships of "trust and confidence" impose a duty to disclose);
**Lang v. Lee, 777 S.W.2d 158, 164 (Tex.App.1989, no writ)** (stating
that a "duty to make a full disclosure of the facts so that the fraud
may be discovered" is required where a fiduciary or confidential re-
lationship exists).  A fiduciary duty may arise either by trust, statute,

-51-

CtrlPDF - www.texts.com

or contract.  See Chien v. Chen, 759 S.W.2d 484, 495 n. 6 (Tex.App.1988, no writ).  The word fiduciary applies to a situation where "trust" exists, and to situations "where 'the law demands an unusually high standard of ethical or moral conduct with reference to one another.'"  Id. (quoting 1 Bogert, Trusts and Trustees, §§ 1,3 (2d ed.1984)).

The doctrine of fraudulent concealment is generally limited to situations in which the defendant has a duty to disclose.  Therefore, "the cases where fraudulent concealment applies are rare, such as those involving doctor-patient, attorney-client, orfiduciary relation-ships."  Patrick v. Howard, 904 S.W.2d 941 (Tex.App.1995); see e.g. Borderlon, 661 S.W.2d at 908 (doctor-patient); Willis v. Maverick, 760 S.W.2d 642, 645 (Tex.1988) (attorney-client); Seibert v. General Motors Corp., 853 S.W.2d 773, 776 (Tex.App.1993, no writ) (fiduciary).  Whether a duty of disclosure exists is a question of law for the Court.  See Seibert, 853 S.W.2d at 778.

In the present case, the court will easily find that defendants satisfy all the six elements of fraud under Texas law.  Two Agents and two prosecutors concealed the material fact from Mr. Maccune that he and his family will never be placed on Federal Witness Protection Program.  The $2,800 disbursement to Maccune's wife was just an artifice to sustain Maccune and his family's trust and confidence.  Prosecutors and Agents failure to disclose the facts amount to actual misrepresentation of true facts.  This concealment also falls within the meaning of intentional suppression of facts.  Agents Nelson and Mertinez were not in silence when they deliberately time and again assured Maccune that he will be placed on the program and he will be out of jail in less than a year.  In one occasion they also asked Maccune what type of profession he will engage in when he will be free.  Agents and prosecutors

-52-

knew from the beginning that what they are doing is wrong but they purposefully concealed the wrong because they do this kind of **monkey business** everyday on a case by case basis. Here, the proof of the claim of fraud and deceit is so clear and convincing that it shocks the mind. How the government will explain (1) the $2,800 check; (2) the moving of his family to a different state; (3) the telephone conversation between F.B.I. Agents and Cindy Maccune (wife) affirming her, Maccune and their two minor children's placement on the program; (4) comforting her about the death threats she were receiving from the Mexican mafia's contact (5) reassuring Maccune's attorney, Sheldon Weisfeld, that his client will be placed on the program? This is clearly a misrepresentation of a material fact. As a federal law enforcement officers both Agents and prosecutors had a solemn duty, close to fiduciary duty, to let Maccune know that (1) he and his family may or may not be placed on the Witness Protection Program; (2) there may be some kind of criteria for him to fall under; (3) his wife may not receive any other money besides 2,800 to relocate; (4) she needs to find a job or anyother way to support the family; (5) he may be serving a sentence of five years or longer. Maccune was and **still is** ready to testify on behalf of the government at any time, any place. So he is doing what he said to the government that he will be doing but on the other hand, government is not doing their end of the bargain because their intention was bogus to start with. They just want to use and abuse people. They failed to realize that somebody may refuse their **"Amusement park."** The doctrine of fraudulent concealment's limited situation squarely applies to Maccune's case. Although the relationship Maccune had developed with Nelson, Mertinez, and Dowd may not involve a high degree of trust and confidence, at

-53-

"Courts of Appeals has stated, however, than even assuring state
law recognizes an abuse of power claim based on the initiation
of a lawsuit, a party can only prevail if he proves the two elements
of an abuse of process claim:  Ulterior motive and an act of abuse."
Id at 97 (citing Simon v. Navon, 71 F.3d 9, 16 (1st Cir.1995));
see Generally Puff v. Runyin, 60 F.Supp.2d 738, 749-50 (N.D.Ohio1999)
("Simply, abuse of process occurs where someone attempts to achieve
through use of the court that which the court is itself powerless
to order....  Plaintiffs argue that the abuse of process here is
the improper continuation of unfounded proceedings against them,
despite defendant's knowledge that plaintiffs were not dealing
drugs....  In an abuse of process case, the improper purpose 'usually
takes the form of coercion to obtain a collateral advantage, not
properly involved in the proceeding itself, such as the surrender
of property or the payment of money, by the use of the process
as a threat or a club.')
The prosecutors and agents had ulterior motive to get all the information
they can from Maccune which they are unable to obtain or lazy to
do their own investigation or they needed a lead.  They let Maccune
testify against the Mexican mafia's trial and convict the mafia.
Their act of abuse came into play when they denied to send any
more checks to Maccune's family and not putting him in the Witness
Program along with his family.

     Under Texas law, the elements of a cause of action for tortious
interference are:  (1) a contract subject to interference; (2) the
defendant's act of interference was willful and intentional; (3)
the defendant's intentional act was a proximate cause of the plaintiff's
damage; and (4) actual damage or loss occurred.  See 5636 __Alpha
   Road v. NCNB Texas Nat'l Bank, 879 F.Supp. 655, 622 (N.D.Tex.1995)

the defendant employed improper methods.  **Id.**  Thus, the elements
are the same for both causes of action.

The contract at issue here are (1) the placement of Maccune
and his family to the Federal Witness Protection Program(**VERBAL
CONTRACT**), (2) Cindy Maccune will receive continual support from
the government for agreeing to relocate (telephonic and oral contract);
(3) Maccune will receive 50% off of his sentence under 5K1.1 enabling
Maccune to be out of jail  in less than five years (written contract).
Like all contracts, these contracts contain a covenant of good faith
and fair dealing.  **See Woods Corporate Associates v. Signet Star
Holdings, Inc.,** 910 F.Supp. 1019, 1034 (D.N.J.1995).  Interference
with this contractual provision is sufficient to satisfy the relevant
element of the tortious interference claim.  Maccune alleges that
defendants acted intentionally, they designed and implemented a
plan. to gain vital information from Maccune.  There is a actual
loss occurred which Maccune will list them all and put a price tag
on each and every single of the properties in his **'Damage Claim'.**

<u>THE BIVENS COMPLAINT</u>

<u>CLAIM NO. FOUR</u>

**Bivens Jurisdiction:**

**Congressional Intent.**  A Bivens action may be available to
remedy a violation of the Due Process Clause, **see**, e.g., **Davis v.
Passman,** 442 U.S. 228, 245, 99 S.Ct. 2264, 60 L.Ed.2d 846 (1979),
but is  available only when "there are no 'special factors counselling
hesitation in the absence of affirmative action by Congress', no
explicit statutory prohibition against the relief sought, and no
exclusive statutory alternative remedy." **Schweiker v. Chilicky,**
487 U.S. 412, 421, 108 S.Ct. 2460, 101 L.Ed.2d 370 (1988( (quoting
Davis, 442 U.S. at 245, 99 S.Ct. 2264).  (**Bivens** action unavailable

-57-

if there is an explicit statutory prohibition against the relief sought).  **Id.**  **487 U.S. at 421, 108 S.Ct. 2460.**

A Bivens cause of action is a judicially created counterpart to 42 U.S.C. § 1983 for claims against federal officials.  **See Bivens v. Six Unknown Named Agents, 403 U.S. 388 (1971).**  Since federal officials do not ordinarily act under color of state law, constitutional violations by federal officials are generally beyond the reach of § 1983.  Bivens fills this void by allowing plaintiffs to recover in suits against federal officials.  Because no federal statutory counterpart for § 1983 exists for actions against federal officials, damages claims against federal officials must be rooted in the Constitution itself.  Bivens, 403 U.S. AT 396, established that "victims of a constitutional violation by a federal agent have a right to recover damages against the official in federal court despite the absence of any statute conferring such a right."  **The Honorable Charles R. Richey, Prisoner Litigation in the United States 204 (West Publishing Co. 1995).**  Mr. Maccune contends that 42 U.S.C. § 1983 is also a valid statute for his claim.  If the government argues that § 1983 is inappropriate then Maccune reincorporates all of his § 1983 claims to **Bivens**.  Whichever **ball-game** the government wants to play, Maccune will makesure that justice have been served to him.  In § 1983 it says 'any person', and the only problem is 'act under color of state law.'  Mr. Maccune is saying when Agents used excessive force and racial epithet, their actions wereso degrading that they acted as a **state-cop** rather than Federal Agents.

Maccune asserts **Bivens** claim for  violation of due process against defendants because Maccune's wife has to sell properties in order to survive and Maccune wants to recover damages against federal officials.

-58-

**Bivens** provides the vehicle for redressing a violation of those rights.  Such an action may be Maintained only against a federal official acting in his/her individual capacity.  See **Federal Deposit Ins. Corp. v. Meyer**, 510 U.S. 471, 114 S.Ct. 996, 127 L.Ed.2d 308 (1994).  To the extent Maccune seeks relief under **Bivens** against the United States, any of its agencies, or any individual defendant in his or her official capacity, such claims should also be granted via 'A claim for abuse of process' and 'A claim for malicious prosecution'.

A **Bivens** action is akin to one under § 1983.  As with a § 1983 action, an individual defendant is entitled to assert the defense of qualified immunity.  **Hunter v. Bryant**, 502 U.S. 224, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991).  Qualified immunity is not merely a defense to liability, but a shield from suit.  **Mitchell v. Forsyth**, 472 U.S. 511, 526, 105 S.Ct. 2806, 86 L.Ed2d 411 (1985).  The determination of whether qualified immunity  is applicable to any defendant is a matter that is initially determined by the court as a matter of law.  The issue goes to the jury only if disputed fact issues must be resolved.  **Hunter v. Bryant**, Supra.
A public official is entitled to qualified immunity  if his conduct violates no clearly established statutory or constitutional law.  **Evans v. Ball**, 168 F.3d 856 (5th Cir.1999); **Sorenson v. Ferrie**, 134 F.3d 325, 327 (5th Cir.1998).  See also **Salas v. Carpenter**, 980 F.2d 299, 305 (5th Cir.1992).  In making this determination, the court undertakes a two-step analysis.  **Duckett v. City of Cedar Park**, 950 F.2d 272, 278 (5th Cir.1992).  See also **Seigert v. Gilley**, 500 U.S. 226, 231-32, 111 S.Ct. 1789, 114 L.Ed.2d 277 (1991).  First, the court determines whether, under current law, the plaintiff has alleged a constitutional violation.  **Seigert v. Gilley**, 500 U.S.

-59-

at 231-32, 111 S.Ct. 1789; **Evans v. Ball**, 168 F.3d at 860; **Salas
v. Carpenter**, 980 F.2d at 305.  Only if the plaintiff has crossed
their threshold, does the court move to the second stage of the
analysis, which requires two separate inquiries:  (1) whether the
allegedly violated right was "clearly established" at the time of
the incident; and , if so , (2) whether the defendant's conduct
was objectively unreasonable in light of the clearly established
law.  Id.; **Hare v. City of Corinth**, 135 F.3d 320, 326 (5th Cir.1998).
In making this determination, "the court should ask whether the
agents acted reasonably under settled law in the circumstances,
not whether another reasonable, or more reasonable, interpretation
of the events can be constrcted five years after the fact"  **Hunter
v. Bryant**, 112 S.Ct. at 537.  "If reasonable public officials could
differ on the lawfulness of the defendant's actions, the defendant
is entitled to immunity." **White v. Taylor**, 959 F.2d 539, 544 (5th
Cir.1992).  The qualified immunity standard is broad enough to encompass
mistakes in judgement by protecting "all but the plainly incompetent
or those who knowingly violate the law." **Hunter v. Bryant**, 112
S.Ct. at 537, quoting **Malley v. Briggs**, 475 U.S. 335, 341, 106
S.Ct. 1092, 1096, 89 L.Ed.2d 271 (1986).

    The allegations of a complaint under **Bivens** must be factually
specific; a complaint that contains mere conclusory allegations
is insufficient to overcome a defendant's qualified immunity defense.
The facts alleged in a complaint must provide a legal basis for
a reasonable finder of fact to grant the plaintiff relief.  **Investors
Syndicate of America, Ins. v. City of Indian Rocks Beach, Fla.,**
434 F.2d 871, 876 (5th Cir.1970).  Conclusory allegations carry
no presumption of truthfulness.  **Kaiser Aliminum,** 677 F.2d at 1050.

## SUBSTANTIVE DUE PROCESS VIOLATION

Courts now considering any claim of substantive due process violation must look for principle guidance to the Supreme Court's most recent deliverances on the concept in **County of Sacramento v. Lewis**, 523 U.S. 833, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998) (holding no violation of substantive due process where highspeed police chase resulted in motorcycle passenger's death), and **Washington v. Gluckberg**, 521 U.S. 702, 117 S.Ct. 2258, 138 L.Ed. 772 (1997) (upholding state's statutory ban on assisted suicide as not violative of substantive due proce). While there decisions in the main confirmed and built on longstanding substantive due process jurisprudence, each gave new emphasis to limiting aspects of the concept that are of special relevance to the claim made in this case. And, both evoked a multiplicity of opinions deflecting continuing disagreements even within court majorities respecting the precise methodology for assessing such claims.

First off, they remind yet again that, as a general proposition, courts must be "reluctant to expand the concept of substantive due process because guideposts for responsible decision-making in this uncharted area are scarce and openended,'" Glucksberg, 521 U.S. at 720, 117 S.Ct. 2258 (**quoting Collins v. Harker Heights**, 503 U.S. 115, 125, 112 S.Ct. 1061, 117 L.Ed.2d 261 (1992)), which means that the courts must "'exercise the utmost care whenever we are asked to break new ground in this field, [collins, 503 U.S. at 125, 112 S.Ct. 1061], lest the **liberty protected** by the Due Process Clause be subtly transformed into the policy preferences of [judges], [**More v. City of East Cleveland**, 431 U.S. 494, 502, 97 S.Ct. 1932, 52 L.Ed.2d 531 (1977)].'" Glucksberg, 521 U.S. at 720, 117 S.Ct. 2258; see also Lewis, 118 S.Ct. at 1714, 118 S.Ct. 1708 (noting traditional reluctance of court to expand concept).

Depending upon whether the claimed violation is by executive act or legislative enactment, different methods of judicial analysis are appropriate.  See Lewis, 118 S.Ct. at 1716.  This is so because there are different "criteria" for determining whether  executive acts and legislative enactments are "fatally arbitrary," an essential element of any substantive due process claim.  Id.

In executive act cases, the issue of fatal arbitrariness should be addressed as a "threshold question," asking whether the challenged conduct was "so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." Id., at 1717 n⊔ 8. If it does not meet the test, the claim fails on that account, with no need to inquire into the nature of the asserted liberty interest. If it does meet the threshold test of culpability, inquiry must turn to the nature of the asserted interest, hence to the level of protection to which it is entitled.  See id.

In the present case Mr. Danny Maccune was not supposed to come to prison in the first place.  The Federal Agents time and time again explained and informed him that he will be placed on Federal Witness Protection Program.  His wife and children are supposed to join him in the 'FWPP' aswell.  This case involves Mr. Maccune testify against a 'Mexican Mafia Drug Lord.'  The Agents with their executive power could not convict the mafia leader without Mr. Maccune's testimony (this credit is also mentioned in defendant PSI  ¶43). The fact in this case reveals that egregious and outrageous conduct of the Agents and prosecutors are so shocking and inhumanly disturbing that it put a new 'sportlight' on the 'contemporary conscience.' Now the Agents and prosecutors are trying to build a 'Chinese. wall' around them and hide behind executive privileges without thinking that 'German wall' can be broken where people counts not the convictions.

So the substantive due process has been violated without any shreeded doubt.

If the claimed violation is by legislative enactment (either facially or as applied), analysis proceeds by a different two-step process that does not involve any threshold "conscience-shocking" inquiry.  The first step in this process is to determine whether the claimed violation invoves one of "those fundamental rights and liberties which are, objectively, 'deeply rooted in this Nation's history and tradition,'" **Glucksberg, 521 U.S. at 720-21, 117 S.Ct. 2258 (quoting Moore, 431 U.S. at 503, 97 S.Ct. 1932),** and "'implicit in th concept of ordered liberty,' such that 'neither liberty nor justice would exist if they were sacrified.'" **Id.** (quoting **Palko v. Connecticut,** 302 U.S. 319, 325, 326, 58 S.Ct 149, 82 L.Ed. 288 (1937)).  It is deeply rooted in this nation's history and tradition FBI will do anything to get information from people and they will promise anything including **'the sun and the moon'** in order to let people testify on behalf of government.  Mr. Maccune was the chief government witness  After the trial, the government totally forgot about Mr. Maccune.  Now suddenly Mr. Maccune became an ordinary inmate like everybody (see transcript sentencing).  In order to restore the public faith and respect for the judicial system, this kind of deeply rooted injustice must be eliminated with anything possible.

The next step depends for its nature upon the result of the first.  If the asserted interest has been determined to be "fundamental," it is entitled in the second step to the protection of srict scrutiny judicial review of the challenged legislation.  **See Id at 721, 117 S.Ct. 2258** (observing that fundamental liberty interest is violated by legislation that infringes it unless the legislation is "narrowly tailored to serve  a compelling state interest'") (quoting **Reno**

CAMPDF - www.tesira.com

v.Flores, 507 U.S. 292, 302, 113 S.Ct⊌ 1439, 123 L.Ed.2d 1 (1993)).
If the interest is determined not to be "**fundamental**" it is entitled
only to the protection of rational-basis judicial review.  **See Id**
at 728, 117 S.Ct⊌ 2258.

Critical to the "fundamental interest" inquiry is the requirement
that it be conducted on the basis of a "careful description of the
asserted fundamental liberty interest."  **Id.** at 720, 117 S.Ct⊌ 2258
(**quotation omitted**).  By this means, the "Nation's history, legal
traditions, and practices..... provide the crucial 'guideports for
reasonable decision-making,'" **id.** at 721, 117 S.Ct. 2258 (**quoting**
**Collins**, 503 U.S. at 125, 112 S.Ct. 1061), that would be threatened
by analyzing the claimed right at too general a level.  See **id.**
at 722, 117 S.Ct. 2258 (rejecting claimants' suggested description
of asserted right to assisted suicide as being one "to die", or
"to choose  how to die," or to "control one's final days," instead
analyzing right more narrowly as one "to commit suicide which itself
includes a right to assistance in doing so").

Guided by the **Glucksberg** and **Lewis** directives on analytic method,
the defendant claims his **substantive due process**.  In this case
the constitutional challenge was directed-and properly directed-
at the decision of the government not to send Maccune to the 'FWPP'
(Federal Witness Protection Program) and incarcerate him:  an executive
act.  Over time, the Supreme Court has elaborated in the kind of
executive conduct that fairly can be said to "shock the  conscience,"
to be "fatally arbitrary in the constitutional sense."  It is conduct
that involves "abusing [executive] power, or employing it as an
instrument of oppression."  **Collins**, 503 U.S. at 126, 112 S.Ct⊌
1061 (quotation omitted).  More objectively, it is conduct more
blameworthy than simple negligence, which never can support a claim

of substantive due process violation by executive act. See **Lewis**,
118 S.Ct⊎ at 1718 (citing **Davidson v. Cannon**, 474 U.S. 344, 348,
106 S.Ct⊎ 668, 88 L.Ed.2d 677 (1986)).  While intentional conduct
is that "most likely" to meet the test, that alone will not suffice;
the conduct must be "intended to injure in some way unjustifiable
by any government interest." **Id.** (Emphasis added).  And, because
specific conduct that in one context would meet the test might not
in another, application of this standard "demands an exact analysis
of circumstances." **Id.** at 1718.

As a first step in assessing whether the executive at issue
here meet this stringest test, we should look to see whether any
benchmarks can be found in the way executive officials and courts
reviewing their actions generally have responded to comparable situations.
See **id.** at 1717 n⊎ 8 (suggesting importance to shocks-the-conscience
inquiry of "an understanding of traditional executive behavior,
of contemporary practice, and of the standards of blame generally
applied to them").

As the Fourth Circuit summarized in **Front Royal**, 135 F.3d
at 287-88:

[S]ubstantive due process is a substantially narrower concept
than procedural due process, for it serves as an absolute check
on certain governmental actions notwithstanding the fairness of
the procedures used to implement those actions.  We have determined
that this absolute check is warranted only where no process could
cure the deficiencies in the governmental action.  In other words,
governmental action offends substantive due process only where the
resulting deprivation of life, liberty, or property is so unjust
that no amount of fair procedure can rectify it. (Internal quotations
and citations omitted).  This high standard is satisfied here.

- 65-

Hence, Maccune's sub-tantive due process claim should be granted.

## "DUE PROCESS CLAUSE"

The Due Process Clause of the Fourteenth Amendment guarantees that no state shall "deprive any person of life, liberty, or property, without due process of law." U.S. CONST. amend. XIV.  Although a literal reading of the clause may suggest that the government only has to afford its citizen a fair process, the clause has been understood to contain a substantive component as well, "bearing certain government actions regardless of the fairness of the procedures used to implement them." **County of Sacramento v. Lewis**, 523 U.S. 833, 118 S.Ct. 1708, 1713, 140 L.Ed.2d 1043 (1998) (quoting **Daniels v. Williams**, 474 U.S. 327, 331, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986).

The Due Process Clause expands the scope of individual liberty beyond the right guaranteed in the first Eight Amendments to the constitution. The Supreme Court has recognized a special group of rights that deserve protection under the Due Process Clause, despite not being explicitly mentioned in the **Bill of Rights**.  The Court has "regularly observed that the Due Process Clause specially protect those **fundamental rights** and liberties which are, objectively, 'deeply rooted in this Nation's history and tradition,' and 'implicit in the concept of ordered liberty,' such that 'neither liberty nor justice would exist if they were sacrified.'" **Washington v. Glucksberg**, 521 U.S. 702, 720-21, 117 S.Ct. 2258, 138 L.Ed2d 772 (1997) (quoting **More v. City of East Cleveland**, 431 U.S. 494, 503, 97 S.Ct. 1932, 52 L.Ed.2d (1977) (plurality opinion), **Palko v. Connecticut**, 302 U.S. 319, 325, 58 S.Ct. 149, 82 L.Ed. 288 (1937), and **id.** at 326, 58 S.Ct. 149) **(emphasis added)** (citations omitted).

Courts are often called on to exercise their reasoned judgement to protect fundamental personal liberties from the overreaching

of the state. See **Planned Parenthood of Southeastern Pennsylvania v. Casey**, 505 U.S. 833, 849, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992). As justice Harlan aptly noted:

> Due process has not been reduced to any formula; its content cannot be determined by preference to any code.  The best that can be said is that through the course of this court's decisions it has represented  the balance which our Nation, built upon postulates of respect for the liberty of the individual, has struck between that liberty and the demands of the organized society.

**Poe v. Ullman**, 367 U.S. 497, 542, 81 S.Ct. 1752, 6 L.Ed.2d 989 (1961) **(Harlan J., dissenting from dismissal on jurisdictional grounds), quoted in casey,** 505 U.S. at 849-50, 1125 S.Ct⊔ 2791 (1992).

In the case at bar, since the government promised Mr. Maccune that he will be participating in the Federal Witness Protection Program, but later  on the government reneged and Mr. Maccune received 112 months of incarceration violates the Due Process Clause of the Fourteenth Amendment.  The framework for analyzing Maccune's due process claim depends on whether the government's alleged violation was by executive act or by legislative enactment.  The Supreme Court's " shocks the-conscience" test, recentlt reaffirmed in **Lewis**, only applies to cases of executive action.  **See Lewis,** 118 S.Ct. at 1716-17.

A recent decision interpreting **Lewis** also provides an example of the kind of oppressive conduct that "shocks the conscience." The government's conduct satisfied the "shocks the conscience" test in **Armstrong v. Squadrito**, 152 F.3d 564 (7th Cir.1998).  In **Armstrong,** the plaintiff was a "deadbeat dad" who was behind on his child support, and, therefore, had to report to the county jail.  **See id.** at 567. Local officials told the plaintiff that following a "brief detention" at the lockup, he would receive a court date and then be released that same day.

CitaPDF - www.texis.com

Due to an administrative error, the plaintiff remained incarcerated for fifty-seven days.  **See id.** at 568.  The court stated that the officials' " will call policy was deficient and their practice of refusing complaints was appalling." **Id** at 582.  The court therefore held that "[w]hat happened to Walter Armstrong shocks the conscience." **Id**  This is exactly the same situation as Danny Maccune.  The government's false promise definitely shocks the conscience where the defendant received 112 months prison term which is polar opposite to his "Federal Witness Protection Program."  The Agents as well as the prosecutors conduct was  sufficiently egregious so as to shock the contemporary conscience.  It is important to note that it is the government's intentional decision to incarcerate Maccune, not the sentence imposed by the court, that shocks the conscience.

## CIVIL CONSPIRACY

## CLAIM NO. 9

In order to suceed on a claim for civil conspiracy the plaintiffs must be able to show the following elements:  (1) a combination of two or more persons;  (2) an object to be accomplished;  (3) a meeting of the minds on the object or course of action;  (4) one or more unlawful, overt acts; and (5) damages as a proximate result thereof.  **See Isreal Pagan Estate v. Cannon**, 746 P.2d 785 (Utah App.1987).  As the Court in Isreal Pagan noted, "it is not necessary in a civil conspiracy action to prove that the parties actually came together and entered into a formal agreement to do the acts complained of by direct evidence." **Id** at 791.  "Instead, conspiracy may be inferred from circumstantial evidence, including the nature of the act done, the relations of the parties, and the interests of the alleged conspirators." **Id.**  At a minimum, however, there must be substantial proof of circumstances from which it reasonable

follows, or may be reasonably inferred, that the conspiracy existed. **See id.** Mere conjecture and speculation is insufficient.

The evidence is clear that all five defendants committed a conspiracy against Mr. Maccune. Judge Tagle should have held an evidentiary hearing to find out about the factual and material facts Mr. Maccune had raised at his formal allocution at the sentencing hearing. When the court marries the multitude of allegations made against defendants, to the "nature of the act done, the relations of the parties, and the interests of the alleged conspirators" it is satisfied that a claim for civil conspiracy has been alleged. As such, the Court should deny the defendants' motion for dismissal with respect to Maccune's civil conspiracy claim.

## INTERSTATE TRAVEL(i.e., commerce clause)
## CLAIM NO. 8

If the court look at the material facts this claim has already been established. Further government took Maccune from one jurisdiction to another by car in order to testify against the Mexican mafia. Hence, the interstate component has been satisfied.

## STATUTE OF LIMITATIONS

A. **RICO:**

**Agency Holding Corp. v. Malley-Duff & Assocs., Inc.,** 483 U.S. 143, 152, 107 S.Ct. 2759, 97 L.Ed.2d 121 (1987) (holding that civil **RICO** actions are subject to a four-year statute of limitations). "[A] civil **RICO** cause of action begins to accrue as soon as the plaintiff discovers, or reasonably should have discovered, both the existence and source of his injury and that the injury is part of a pattern." **Agristor Fin. Corp. v. Van Sickle,** 967 F.2d 233, 241 (6th Cir.1992) (quoting **Bivens, Gardens Office Bldg., Inc. v. Barnett Bank of Florida, Inc.,** 906 F.2d 1546, 1554-55 (11th Cir.1990)).

-69-

## B. § 1983:

The basic law regarding the statute of limitations to be applied to § 1983 actions has been established for a decade.  "[T]he lenght of the limitations period, and closely related questions of tolling and application, are to be governed by state law." **Wilson v. Garcia,** 471 U.S. 261, 269, 105 S.Ct. 1938, 1943, 85 L.Ed.2d 254 (1985); see also **Board of Regents v. Tomanio,** 446 U.S. 478, 483, 100 S.Ct. 1790, 1794, 64 L.Ed.2d 440 (1980).  The particular period which is to be used is the one which applies to "tort actions for the recovery of damages for personal injuries." **Garcia, 471 U.S. at 276, 105 S.Ct. at 1947.**  That could be somewhat ambiguous because different statutes of limitations could apply to different torts in a given state.  Any ambiguity is avoided, however, by the corollary that in the event that the state has multiple statutes of limitations, "courts considering § 1983 claims should borrow the general or residual statute for personal injury actions." **Owens v. Okure,** 488 U.S. 235, 250, 109 S.Ct. 573, 582, 102 L.Ed2d 594 (1989).

## DAMAGES

### A. Compensatory Damages.

The purpose of damages is to compensate the plaintiff for an injury caused by a defendant.  **Carey v. Piphus,** 435 U.S. 247, 254-55, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978); see **Memphis Community School Dist. v. Stachura,** 477 U.S. 299, 306, 106 S.Ct. 2537, 91 L.Ed.2d 249 (1986).  Compensatory damages indemnify the injured party only for the injury sustained, in order to "make good or replace the loss caused by the wrong or injury." **McMillian v. F.D.I.C.,** 81 F.3d 1041, 1055 (11th Cir.1996) (internal citations omitted); **Reese v. United States,** 24 F.3d 228, 231 (Fed.Cir.1994).  This includes not only out of pocket losses and economic injury, but compensation for non-monetary injury, such as any pain and suffering realized

-70-

CDxPDF - www.texlia.com

by the plaintiff.  **Stachura, 477 U.S. at 306-07, 106 S.Ct. 2537.**
Simply put, compensatory damages make the injured party whole.
See Mcmillian, 81 F.3d at 1055; See also <u>Reynolds V. Pegler, 123</u>
<u>F.Supp.</u> 36, 38 (S.D.N.Y.1954), affd, 223 F.2d 429 (2d Cir.1955)
The jury award compensated plaintiff for the injury he suffered.
The determination of damage awards is within the province of the
jury.  <u>**Paolitto v. John Brown E. & C., Inc.**</u>, 151 F.3d 60 (2d Cir.1998);
<u>**Ismail v. Cohen**</u>, 899 F.2d 183, 186 (2d Cir.1990).  Damage awards
should only be set aside if the award is "so high as to shock the
judicial conscience and [the award] constitute[s] a denial of justice."
Ismail, 899 F.2d at 186; <u>**O'Neil v. Krzeminski**</u>, 839 F.2d 9, 13 (2d
Cir.1988).

    Mr. Maccune lost the following properties:

(1)   1996 Ford Conversion Van----  $34,000.00

(2)   1996 Chevy Metro ----  $22,000.00

(3)   1986 860- Excavator Crane ----$26,000.00
     (Maccune's wife sold it dirt-cheap.)

(4)   1992 416-Caterpillar Back-hoe ---- $64,000.00

(5)   1992 D-5 Caterpillar Bulldozer ---- $62,000.00

(6)   1992 Caterpillar with Bucket(two) ---- $44,000.00
    -(Maccune's wife sold it dirt-cheap.)

(7)   Three Tractors with equipment ---- $15,000.00

(8)   1972 Ford 12-yard Dump Truck ---- $18,000.00

(9)   1978 Huff-loader   ---- $24,000.00
    (Maccune's wife sold it dirt-cheap.)

(10)  Home with basement and 5-acres of land
    (318-58th st. Pullman, MI) ---- $225,000.00

(11)  20 acres with garage business ----$44,000.00
    (340-58th st. Pullman, MI)

(12)  Home furniture ---- $22,000.00

(13)  5-Acres for Business, 109th st. Pullman,MI ----$60,000.00

(14)  5-Acres with house 110th st. Pullman,MI---- $22,000.00

(15)  5-Acres in Kenddel MI with Trailor ---- $22,000.00

(16)  20-Acres Trenk yard ---- $18,000.00

(17)  Wreckers boom Trucks ---- $5,000.00

(18)  5-Acres at 312-58th st. Pullman, MI ---- $18,000.00

(19)  Hand tools Snap on, Craftsman ---- $12,000.00

Total amount   ----- $638,5000.00

(20)  Business Loss ---- $90,000 to $160,000 a year.

## B.  Punitive Damages.

Punitive damages are awarded "to punish [defendants] for [their] outrageous conduct and to deter [them] and others like [them] from similar conduct in the future." **Smith v. Wade**, 461 U.S. 30, 54, 103 S.Ct. 1625, 75 L.Ed.2d 632 (1983) (citation omitted). Punitive damages may be awarded "when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." **Id.** at 56, 103 S.Ct. 1625; see also **Mathie v. Fries**, 121 F.3d 808, 815 (2d Cir.1997).

Hence, for Punitive Damages Mr. Maccune is requesting a $50 million dollars reward.

## STATUTE OF LIMITATIONS

**Bivens Claims:**

A **Bivens** action is controlled by the applicable state statute of limitations.  **See Alford v. United States**, 693 F.2d 498, 499 (5th Cir.1982) (per curiam).  This Court, applying **Texas Law**, has held that the statute of limitations period on a **Bivens** claim is two years.  **See Pena v. United States**, 157 F.3d 984, 987 (5th Cir.1998).

Hence, Maccune's Bivens claim is not time barred.

-73-

## RELIEF REQUESTED

Movant asks this Honorable Court to grant relief from these constitutional violations based on the facts  he has presented. Movant also asks his freedom be restored and he be returned to his family so he can give his children the support they need and deserve, and all other relief deemed necessary.


## CERTIFICATE OF SERVICE

I, Danny L. Maccune, under 28 U.S.C. § 1746, do hereby certify that the foregoing to be true and correct to best of my knowledge. And was deposited in a U.S. mail box at FCI Elkton, Ohio on 2/13            , 2000.



Respectfully submitted,

Dated:   2/13  , 2000.

Danny L. Maccune
Reg. # 77909-079
P.O.Box 130 (Unit E/A)
Elkton, Ohio 44415

(citing Persoal Preference Video, Inc. v. Home Box Office, Inc., 986 F.2d 110, 111 (5th Cir.1993)); Southwestern Bell Tel. Co. v. John Carlo Texas, Inc., 843 S.W.2d 470 (Tex.1992).  There is a difference between tortious interference with contract and tortious interference with contract expectancy.  Maccune claims that the defendants violated both.  Any contract or business expectancy based on false promises, bad faith, wrong intention, a tactics of whitewash would be contrary to case law and statute and there by illegal.

In order to plead acase of tortious interference with contract or contract expectancy, the plaintiff must allege:  (1) the existence of a contract expectancy; (2) the defendant's knowledge thereof; (3) intentional interference with the contract or expectancy;(4) use of improper means or method to interfere; and(5)  loss suffered by the plaintiff resulting from disruption of the contract or contract expectancy.  <u>Maximus, Inc. v. Lockheed Info. Management Sys. Co.</u>, 254 Va. 408, 493 S.E.2d 375, 378 (1997); see also <u>Perk v. Vector Resources Group, Ltd.</u>, 253 Va. 310, 485 S.E.2d  140, 143 (1997).  "Tortious interference" means only that the interference was intentional and improper under the circumstances, not that the improper methods used were inherently illegal or tortious.  <u>Maximus,</u> 493 S.E.2d at 379.

Martindale contends that the court should rely on Perk for the elements of tortious interference with contract as opposed to tortious interference with contract expectancy as stated in Maximus.  In Perk, the Virginia Supreme Court listed four elements of tortious interference with contract.  485 S.E.2d at 143.  Because the court did not incorporate "improper means" as an element, Martindale seems to imply that improper means is not relevant.  However, the Perk Court also stated that in order to present a prima facie case of tortious interference, the plaintiff must allege and prove that

least there was some sort of trust developed among them; otherwise
how can they trust Maccune in his testimony?  So obviously there
was a fiduciary or confidential relationship had developed among
them.  Since there is a trust involve 'of a degree' or'to a kind'
a disclosure was necessary⸴  Based on this material facts tortious
interference has definitely budded.

## TORTIOUS INTERFERENCE WITH CONTRACT

It is abundantly clear the Federal Torts Claim Act allows suit
"in the same manner and to the same extent as a private individual
under like circumstances," against the Government, "Provided, That,
with regard to acts or omissions of investigative of law enforcement
officers of the United States Government, the provisions of this
chapter and section 1346(b) of this title shall apply to any claim
arising, ..., out of assault, battery, <u>false imprisonment, false
arrest, abuse of process,</u> or <u>malicious prosecution."</u>  28  U.S.C.
§§2674 and 2680(h) (emphasis added).

Maccune claims assult (excessive force) and abuse of process.
Maccune has alleged a cause of action against two Agents, two prose-
cutors and a judge.  Under the <u>FTCA</u>, only the United States, not
its agencies and/or employee, may be sued <u>"eo nomine".</u>  Government
may try to dismiss this claim for lack of subject matter jurisdiction.
See <u>Lora-River v. Drug Enforcement Administration Department of
Justice</u>, 800 F.Supp. 1049, 1050 (D.P.R.1992) (citing 28 U.S.C.
§ 2679(a)).  But all the defendants are liable for tortious interference
with contract.

## ABUSE OF PROCESS

The action of abuse of process is less developed in the civil
code than in the common law.  In <u>Boschette v. Buck</u>, 916 F.Supp.
91, 98 (D.P.R.1996), the court also recognized that the First circuit

-54-